UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

PLUMBERS AND PIPEFITTERS LOCAL : Civil Action No. 1:08-cv-04063-JGK
UNION NO. 630 PENSION-ANNUITY :
TRUST FUND, : CLASS ACTION
 :
       Plaintiff, : SECOND AMENDED CLASS ACTION
 : COMPLAINT
 :
   vs. :
 :
ARBITRON, INC., et al., :
 :
       Defendants. :
 :

———————————————————— x

Lead Plaintiff Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund ("Lead Plaintiff" or "Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Arbitron, Inc. ("Arbitron" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of Arbitron, testimony from a hearing held by the New York City Council and the Joint Committee on Consumer Affairs and Civil Rights (the "NYC Council hearing") and publicly available legal actions involving Arbitron.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of Arbitron between July 19, 2007 and November 26, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Arbitron operates as an international media and marketing information services firm.  The Company primarily provides radio audience measurement and related services in the United States to radio stations, advertising agencies and advertisers.  Arbitron maintains a virtual monopoly in the field of radio audience measurement, which means that if radio stations do not subscribe to Arbitron's ratings service, those stations will have no ratings data to present to advertisers who purchase advertising time on radio stations.

3.      Arbitron collects data by recruiting a random sample of individuals (a "panel"), which is meant to portray a representative demographic sample of the population in the market, and conducts an audience measurement survey.

4.      This action concerns Arbitron's development and commercialization of the Portable

People Meter (the "PPM").  The PPM is an electronic measurement device that measures radio audience usage.  The PPM, which looks like a small pager, is worn or carried by an Arbitron panelist and detects signals that identify the source of a broadcast.  In other words, the PPM detects what a panelist is listening to on the radio.  The audience estimates gathered from each survey is used as the buy/sell data (or "currency") for radio stations and advertisers.

5.      Prior to the development of the PPM, Arbitron measured audience listenership using a Radio Listening Diary ("Diary") in which participants would manually record the radio stations they listened to each day.  However, for the past several years, Arbitron started taking steps to replace the Diary method of audience measurement with the PPM method.

6.      By the start of the Class Period, Arbitron had entered into contractual obligations with broadcasters for the new PPM service.  Under these contracts, Arbitron would be paid only when the PPM service commercialized and the Diary system was no longer used.  It was, therefore, essential for Arbitron to commercialize the PPM service as soon as possible.  Accordingly, during the Class Period, Arbitron had established an aggressive rollout schedule which called for the commercialization of the PPM system into the top 10 radio markets by the fall of 2008, including the rollout of PPM as currency in New York by December 2007.

7.      Unbeknownst to investors, however, Arbitron's development and progress of its PPM system was plagued with material problems which would delay the scheduled rollout in nine markets, including New York, Los Angeles, San Francisco and Chicago.  Throughout the Class Period, Defendants knew or recklessly disregarded that Arbitron was experiencing severe problems recruiting panelists and getting them to properly use the PPM equipment.  The deficiencies with panelist recruitment and compliance, along with problems of small panel size and failure to follow the PPM methodology that the radio industry relied upon, caused the PPM data to be inaccurate and

unreliable.  These problems were magnified in the 18-34 and minority demographic groups for PPM panels.  Arbitron also experienced a shortage of its PPM equipment, which further delayed its rollout schedule.

8.      Drastic declines in ratings for many radio stations based on PPM data raised issues about who and what was actually being measured and how the PPM methodology manipulated that data.  As a result, beginning in 2006, Arbitron started receiving complaints from its customers (various broadcasters) and others, including the Media Ratings Council ("MRC"), the leading accrediting agency for audience measurement research, in connection with the sufficiency and reliability of the PPM's data.

9.      On May 30, 2007, the MRC sent Arbitron a letter notifying the Company that the PPM services in the Philadelphia market violated the MRC's Minimum Standards.

10.     As detailed herein, although Defendants were aware of the major problems with the PPM system and complaints throughout the Class Period, Defendants marketed the PPM service as a significant improvement to the Diary system and issued numerous positive statements about Arbitron's rollout schedule for the PPM ratings system, its reliability and Arbitron's financial outlook.  For example, Defendants represented that the rollout schedule for the Company's PPM system was "on track" and "the audience data are statistically reliable."  These representations and numerous others detailed herein were materially false and misleading because, among other things, Defendants knew that the PPM system was not reliable and that the severity of the problems with the PPM system would make it impossible to commercialize the system in accordance with Arbitron's stated rollout schedule.  Indeed, Defendants eventually admitted that they had been receiving numerous complaints from Arbitron customers, the New York City Council and the MRC months prior to the eventual disclosure that Arbitron would be delaying the PPM's rollout, even though

Defendants made statements that there were no major problems with the system and that they were ready to commercialize.

11.   Moreover, while Defendants made general disclosures regarding recruitment and noncompliance, they did not in any way disclose the extent of these problems and the effects they had on the PPM's reliability.  On the contrary, Defendants misled investors into believing that these problems would be resolved, that the PPM data was reliable and that the rollout deadlines would be met.

12.   Before the market learned the truth about Arbitron and its PPM ratings service – *i.e.,* that the Company would be delaying the rollout of the PPM system to address certain problems – Company insiders took advantage of the increase in the Company's stock driven by the public's false belief that the PPM service would soon commercialize in the top 10 radio markets, by selling 178,879 shares of Arbitron stock and reaping more than $8.9 million in gross proceeds.  These insider sales were unusual and suspicious because the majority of the sales took place just weeks before Arbitron disclosed the delay in the PPM rollout and because the sales were primarily made by insiders who had direct knowledge of the problems with the PPM.

13.   On November 26, 2007, Defendants were unable to continue to conceal the truth about the rollout of the PPM system and shocked investors when they announced that Arbitron was delaying further commercialization of the PPM in order to address certain concerns from customers and other constituencies.  Analysts were also shocked by Arbitron's delay of the PPM rollout, especially since Arbitron repeatedly emphasized that they it was "on track" with commercializing the PPM and reiterated its confidence in the process.  Defendants' disclosure that the Company would be delaying the commercialization of the PPM was a belated admission that the PPM system

was not performing as the Company had previously announced.  In response to this announcement, the price of Arbitron stock declined $7.21 per share, or over 14.74%.

14.     In the wake of Arbitron's PPM debacle, numerous radio broadcasters and other organizations started taking action against Arbitron and its PPM system.  On February 28, 2008, the MRC denied accreditation to Arbitron's PPM ratings service in Philadelphia and New York.  On October 10, 2008, the Attorneys General of New York and New Jersey sued Arbitron over the Company's flawed and misleading PPM methodology.  On September 2, 2008, a group of broadcasters and trade associations filed an emergency petition with the Federal Communications Commission ("FCC") urging the FCC to open an inquiry into Arbitron's PPM services.  The FCC has since commenced an investigation.  The U.S. House of Representatives Committee on Oversight and Government Reform has likewise initiated an investigation into the methodological flaws of Arbitron's PPM service.

15.     Today, Arbitron has repeatedly tried to gain MRC accreditation for its PPM services in various markets and continues to fail.  It has been almost two years since the end of the Class Period, and Arbitron has only gained accreditation in one market.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts and practices complained of herein, including the preparation

and dissemination of materially false and misleading information, occurred in substantial part in this District.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

20.     Lead Plaintiff Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund purchased Arbitron common stock during the Class Period, as detailed in the certification previously filed in this litigation and incorporated by reference herein, and was damaged thereby.

21.     Defendant Arbitron, through its subsidiaries, provides media and marketing information services in the United States and internationally.  During the Class Period, Arbitron's principal place of business was located at 142 West 57th Street, New York, NY 10019.  The Company has since moved its headquarters to Columbia, Maryland – where most of Arbitron's operational departments were located during the Class Period.

22.     (a)     Defendant Stephen B. Morris ("Morris") was at all relevant times, Arbitron's Chairman, Chief Executive Officer ("CEO") and President.  As of January 12, 2009, Michael P. Skarzynski replaced Defendant Morris as President and CEO of Arbitron.

(b)     Defendant Sean R. Creamer ("Creamer") is, and was at all relevant times, Arbitron's Chief Financial Officer ("CFO").

(c)     Defendants Morris and Creamer are collectively referred to herein as the "Individual Defendants."

23.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal

corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

24.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

26.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Arbitron common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Arbitron's business, operations, management and the intrinsic value of Arbitron common stock; (ii) enabled the Individual Defendants and other Arbitron insiders to sell 178,879 shares of their personally-held Arbitron common stock for gross proceeds in excess of $8.9 million; and (iii) caused Plaintiff and other members of the Class to purchase Arbitron common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired  the common stock of Arbitron between July 19, 2007 and November 26, 2007, inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Arbitron common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Arbitron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arbitron; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

33.     The allegations made herein are further supported by the first-hand knowledge of eleven (11) confidential informants ("CIs").  These informants are former Arbitron employees who provided facts from various departments within the Company.  As detailed below, the CIs each

served in positions at Arbitron which provided them with access to the information they are alleged to possess.

34.    CI 1 is a former Manager of Panel Compliance Operations at Arbitron's PPM Panel Operations division in Columbia, Maryland.[1] CI 1 was employed by Arbitron from August 2000 to October 2007.  As Panel Compliance Manager, CI 1 was primarily responsible for overseeing the recruitment of panelists, as well as the on-going relationship with panelists.

35.    CI 2 is a former Market Analyst and PPM Supervisor for Arbitron in Columbia, Maryland.  CI 2 was employed by Arbitron from 2001 until August 2007.  During 2006 and 2007, CI 2 was primarily responsible for developing managers for the various PPM markets and reviewing PPM panelist data as it was collected.  CI 2 reviewed panelist data from various PPM markets including Philadelphia and New York.

36.    CI 3 is a former PPM Research Associate employed by Arbitron from July 2007 through March 1, 2008 in Columbia, Maryland.  CI 3 was responsible for recruiting individuals into the Diary and the PPM survey methods.

37.    CI 4 is a former Senior Bilingual Customer Service Consultant for Arbitron.  CI 4 began working in the Customer Service Department of one of Arbitron's call centers from 2001 until September 2007.  CI 4 was responsible for handling incoming calls from clients regarding questions about Arbitron's various products, including the PPM system.

---

[1]    Since 1994, Columbia, Maryland has been the center of Arbitron's business operations, including its survey research, engineering and data collection/production operations.  Approximately 71% of Arbitron's full time employees reside in Maryland.

38.     CI 5 worked at Arbitron from 1995 to December 2007 in various positions.  From 2005 to 2007, CI 5 was promoted to Senior Vice President of Client Software in New York and was responsible for overseeing 25 software applications for Arbitron.

39.     CI 6 worked for Arbitron from 2000 through June 2007 in various positions including Panel Relations Specialist, Panel Operations Coordinator and Senior Quality Assurance Specialist.

40.     CI 7 was employed by Arbitron from October 2006 through June 2007 as a Panel Relations Specialist in Columbia, Maryland and was primarily responsible for contacting panelists to assist with installing the PPM equipment and ensuring that panelists were using the PPM device properly.

41.     CI 8 is a former PPM Distribution Department Supervisor for Arbitron in Columbia, Maryland.  CI 8 was employed by Arbitron from December 2001 through July 2007.  As PPM Distribution Department Supervisor, CI 8 was responsible for setting up the department and assigning and configuring PPM equipment for specific panelists.

42.     CI 9 is a former Senior Operations Project Manager employed by Arbitron from March 2007 through December 2007 in Columbia, Maryland.  CI 9 was responsible for providing technical support, as well as testing for the PPM software and its upgrades.

43.     CI 10 is a former Vice President of Marketing for Arbitron in Columbia, Maryland.  CI 10 was employed by Arbitron from approximately 2000 until September 2007.

44.     CI 11 worked at Arbitron from November 1984 to March 2009.  During the Class Period, CI 11 was employed as Senior Vice President of Arbitron's Ratings Services and was responsible for overall product management of Arbitron's U.S. syndicated ratings measurement services, including the commercialization of the PPM system.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

45.     Defendant Arbitron describes itself as an "international media and marketing information firm serving radio broadcasters, cable companies, advertisers, advertising agencies and out of home and online media advertising companies in the United States and Europe."  The Company primarily provides audience measurement and related services to radio stations, advertising agencies and advertisers.  Arbitron maintains a virtual monopoly over the radio audience measurement industry and derives approximately 88% of its revenues from its radio audience measurement services and related software.

46.     As part of its radio audience measurement services, Arbitron conducts surveys, which measure audience size and such demographic information as age, sex, income level, spending habits and listening schedules in various market areas.  Within each market, the Company recruits a "panel" of individuals from various demographic groups in connection with its audience measurement surveys.  The panel is intended to be a representative sample of individuals in the particular market being measured.  Arbitron then sells the data it collects from the surveys to advertisers and broadcasters, who respectively buy and sell advertising time based on the survey results.  Advertisers rely heavily on Arbitron's ratings to decide which stations to buy "airtime" from and at what price, while radio stations are dependent on advertising sales as their predominant source of revenue.

47.     The Company has two primary means of radio audience measurement: (i) the Diary-based ratings service; and (ii) the PPM ratings service.  Prior to the development of the PPM ratings service, Arbitron only collected audience data via the Diary-based ratings system.  The Diary-based system required participants to carry a diary and manually record which radio stations they were

listening to and the times they were listening, every day for one week.  The Diary participants then mailed their diaries to Arbitron, who recorded the information into its database.

48.     According to Arbitron, the Diary-based system, which was accredited by the MRC, is "the most comprehensive and effective method for recording radio listening behavior" and "remains the most widely respected radio audience measurement tool."

49.     In 1992, Arbitron began its development of the electronic PPM system of audience measurement.  Arbitron created the PPM ratings service to replace the traditional Diary system of tracking ratings, with the hope that the new system would create greater precision in audience measurement and would make it easier to collect accurate data from survey participants.  Unlike the Diary-based system, the PPM system does not require panelists to recall or write down what radio stations they listened to over the course of the day.

50.     In 2007, Arbitron began marketing the PPM system and advertised the service as an improvement to the Diary-based system.  In connection with the Company's efforts to replace the Diary-based system, Arbitron entered into contractual obligations with broadcasters for the new PPM service and increased the data fees that changed radio status by approximately 65%.  Because Arbitron's customers were not required to pay for the PPM service until it was commercialized in a certain market, the Company needed to commercialize the PPM service as quickly as possible in order to start monetizing on the contracts.

51.     As detailed further herein, the implementation of the PPM service was much more difficult than Defendants had originally anticipated and did not meet Arbitron's goal of providing more accurate data.  Instead, prior to and during the Class Period, the Company experienced various problems with panelist recruitment and compliance, reliability of data, adequate sample size and representation of certain age and minority groups, PPM equipment shortages and MRC

accreditation.   The severity of these problems ultimately caused Arbitron to delay the commercialization of its PPM ratings service.

### The PPM Ratings System

52.     The PPM system is an electronic system of audience measurement that is purportedly capable of measuring radio, broadcast television, cable television, Internet broadcasts, satellite radio and television audiences, and retail store video and audio broadcasts.

53.     The PPM is a small electronic device that is carried by Arbitron panelists throughout the day for several months.  The device detects codes embedded in a radio broadcast and is used to identify the media sources that a panelist is listening to or watching.  Every evening, the panelist must dock the PPM into its charging station, which sends the day's collected codes to Arbitron for tabulation.  The device is connected to the telephone line, which enables Arbitron to download the data.  Arbitron then converts the collected data into ratings, which allows advertisers to determine the amount of listeners for a given radio station.

54.     PPM panelists are randomly recruited by telephone and are asked to participate in the survey for a period of up to two years.  In order to be recruited, each member of a household must agree to participate in the PPM survey method, including any household member six years old or older.  In exchange for their participation in the survey, panelists receive monthly cash incentives.

55.     Once an entire panel is recruited according to Arbitron's predetermined sample size and demographics, the PPM system is in the "pre-currency" phase.  During the pre-currency period, Arbitron Panel Relations Specialists are responsible for ensuring that the panelists are in compliance. The Diary method is contemporaneously used by other panelists during the PPM's pre-currency period so that Arbitron can continue to produce reliable ratings for its customers.

56.     If the PPM data obtained during the pre-currency phase is determined to be accurate, the PPM then "goes currency," *i.e.,* commercializes.  It is during this stage that currency ratings are

then used to set the rates for advertising on radio stations.  During the currency phase, the Diary method is no longer used.

57.     On March 14, 2006, Arbitron issued a press release announcing that it will be commercializing the PPM ratings service to replace the Diary-based ratings service as the data source for determining rates for radio advertising.  Arbitron also announced that it had a market-by-market rollout schedule for its PPM ratings service.  According to the press release, Arbitron's plan was to rollout the PPM service "into the top 10 radio markets by the fall of 2008, and into all of the top 50 radio markets two to three years thereafter."  The PPM rollout, and its timing, was essential to Arbitron because the Company would not get paid by its customers until the PPM system was commercialized.

58.     The following chart represents Arbitron's rollout schedule during the Class Period:

**PPM Rollout Schedule**

(Scale: ● = high investment, ○ = moderate investment)

| City | PPM Currency | 1Q 2007 | 2Q 2007 | 3Q 2007 | 4Q 2007 |
|------|--------------|---------|---------|---------|---------|
| Philadelphia | March 2007 | ● | ○ | | |
| Houston | June 2007 | ○ | | | |
| New York | December 2007 | | ● | ● | ○ |
| Los Angeles | March 2008 | | ○ | ● | ● |
| Chicago | March 2008 | | ○ | ● | ● |
| San Francisco | June 2008 | | | ○ | ● |
| San Jose | June 2008 | | | ○ | ● |

| City | PPM Currency | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 |
|------|--------------|---------|---------|---------|---------|
| Los Angeles | March 2008 | ○ | | | |
| Chicago | March 2008 | ○ | | | |
| San Francisco | June 2008 | ● | ○ | | |
| San Jose | June 2008 | ● | ○ | | |
| Dallas | September 2008 | ● | ● | ○ | |
| Washington D.C. | December 2008 | | ● | ● | ○ |
| Detroit | December 2008 | | ● | ● | ○ |
| Atlanta | December 2008 | | ● | ● | ○ |
| Boston | March 2009 | | | ● | ● |
| Miami | June 2009 | | | | ● |
| Seattle | June 2009 | | | | ● |
| Phoenix | June 2009 | | | | ● |
| St. Paul | June 2009 | | | | ● |
| San Diego | June 2009 | | | | ● |

59.     As demonstrated in the chart above, the New York market (along with the Middlesex-Somerset-Union and Nassau-Suffolk markets) was scheduled to go currency on December 31, 2007, followed by the Los Angeles, Chicago, San Francisco, San Jose and Dallas-Ft. Worth markets.

### Throughout the Class Period, Arbitron's PPM Ratings Service Was Suffering from a Host of Undisclosed Adverse Factors

60.     Throughout the Class Period, Arbitron's business was suffering from numerous undisclosed problems that eventually caused the Company to delay the commercialization of its PPM service in nine markets.

### Failure to Obtain Accreditation by the MRC

61.     As part of the commercialization process, Arbitron, like other Measurement Service companies,[2] seeks accreditation of its products and services from the MRC.  The MRC is an independent organization of broadcasters that sets industry standards for audience measurement. Accreditation by the MRC ensures that an audience measurement service and its implementing methodology have met the minimum standards for reliable audience measurement.

62.     The MRC has established, and updates, its "Minimum Standards," which set forth the requirements that are necessary for Measurement Services to attain MRC accreditation.  For example, among other things, the Minimum Standards require the sample panel for audience surveys to accurately reflect the demographic being measured.

63.     To obtain accreditation from the MRC, Arbitron must go through several processes to demonstrate that their ratings services are conducted in conformity with the Minimum Standards and

---

[2]     The MRC's Voluntary Code of Conduct defines a "Measurement Service" as an "organization that produces one or more syndicated audience measurement products, including 'currency' audience measurement products, commerce-significant products or other ancillary products."  Under this definition, Arbitron is a Measurement Service.

that their methodology is accurate, reliable and valid and does not introduce any bias into the process. Specifically, prior to accreditation, Arbitron must undergo: (i) an independent audit of the market; (ii) a review of the audit by a committee of industry representatives; and (iii) a pre-currency period during which customers prepare for transitioning from one service to another. The independent audit identifies any violations of the MRC's policies and procedures. The audit report is shared with the MRC Committee, who then votes on accreditation.

64.     The MRC also requires that companies providing measurement services comply with a Voluntary Code of Conduct. According to the MRC's Voluntary Code of Conduct, participating Measurement Services "shall use best efforts to obtain MRC accreditation of all 'currency' audience measurement products." In addition, "participating Measurement Services that seek to replace an accredited currency measurement product with a new currency measurement product (both products provided by the same Measurement Service) will use best efforts to obtain accreditation of the new product prior to its commercialization because of the reliance placed on the accreditation process by users" and "[s]trong consideration should be given to discontinuing the existing accredited currency product only when the replacement currency product has successfully achieved accreditation." The Voluntary Code of Conduct further requires "Measurement Services [to] accurately represent the status of accreditation to their customers."

65.     Accordingly, the Voluntary Code of Conduct requires Arbitron to "use best efforts" to obtain accreditation of the PPM service before commercialization.

66.     In January 2007, Arbitron received accreditation from the MRC to begin using the PPM system as currency in Houston, Texas, and ultimately commercialized there in June 2007. This was the first, and only, market to receive accreditation.

67.     After the accreditation of the PPM in Houston, Arbitron attempted to introduce the PPM in Philadelphia and New York.  However, instead of using the accredited methodology applied in Houston, which consisted of recruiting panelists in person based on their addresses, in order to cut costs, Arbitron employed a telephone-based recruitment methodology for the Philadelphia and New York markets.  This telephone-based system was inherently flawed, as it predominantly targeted panelists with landline telephones and ignored one-third of the market who do not have a landline.

68.     Prior to the Class Period, Arbitron once again sought accreditation from the MRC, this time for the Philadelphia market.  As part of the accreditation process, Arbitron produced pre-currency data in this market, retained Ernst & Young to conduct an independent audit and provided the results of the Ernst & Young audit to the MRC's PPM Audit Committee.

69.     The Ernst & Young independent audit revealed that Arbitron failed to provide certain information, including data regarding cell-phone only households, monthly sample balancing reports and listener estimates.  The audit also revealed that, in a sampling of panelists by Ernst & Young, approximately one-third were found to be noncompliant with the required procedures for the PPM.

70.     On May 30, 2007, Arbitron received a letter from the MRC notifying the Company that, after conducting independent external audits of the PPM methodology in Philadelphia, the MRC had concluded that the PPM services in this market violated MRC Minimum Standards.  Specifically, the MRC notified Arbitron that there was a "[s]evere under-representation of tabulated 18-24 panelists relative to the universe estimates because of sampling/process issues" and that the "data has serious known flaws in a key demographic."  The MRC also stated that it did "not endors[e] Arbitron's 'target' of a 75% in-tab rate."[3]

---

[3]     "In-tab" refers to the number of installed PPM meters that are actually providing usable data for a given survey.

71.     According to CI 11, former Senior Vice President of Arbitron's Ratings Services, it was Arbitron's policy to launch a service only after an audit was completed, reviewed and shared with the MRC.  If the audit was "clean" and there was nothing that had to be "fixed," CI 11 noted that Arbitron moved ahead with the commercialization.[4]  CI 10, former Vice President of Marketing, also noted that Arbitron had "historically been very specific" when it told its clients that it intended to have MRC accreditation before moving forward into any markets.  However, over time, the "verbiage" used by the Company "softened" and Arbitron tried to position its failure to obtain accreditation prior to commercialization as a minor change, while many broadcasting companies viewed it as a significant change.

72.     While Defendants were put on notice by the MRC in May 2007 that the PPM system was experiencing problems and did not satisfy Minimum Standards, less than two months later Defendants announced that the PPM service was reliable and "on track" to commercialize, even though Arbitron had not remedied the problems identified by the MRC.

73.     On February 28, 2008, after the Class Period, the MRC denied accreditation for the commercialization of Arbitron's PPM system in Philadelphia and New York based on the PPM's failure to satisfy the MRC's Minimum Standards.  Since the end of the Class Period, Arbitron has repeatedly submitted its PPM service to the MRC for accreditation in various markets and the PPM service has repeatedly failed the MRC's accreditation process.

---

[4]     In contravention of their own policy and the MRC's Voluntary Code of Conduct, Arbitron commercialized the PPM service in Philadelphia on March 2007, without first using their best efforts to obtain accreditation in that market.

**Problems with Panelist Recruitment and Compliance**

74.     While the PPM ratings service was created to simplify the process of measuring audience data, throughout the Class Period, Arbitron experienced difficulties recruiting panelists to participate in the PPM surveys.  According to CI 3, a former PPM Research Associate, this was because of the length of commitment time of the PPM survey[5] and the fact that everyone in a household was required to participate.  During the eight months of CI 3's employment at Arbitron, CI 3 stated that only one person agreed to participate in the PPM program.

75.     CI 2 confirmed that recruitment was challenging, particularly in the New York market.  According to CI 2, a former Market Analyst and PPM Supervisor, the New York market began recruitment in January 2007 and, because of tremendous difficulties with recruitment, by March 2007, it was clear that the scheduled rollout would be delayed.

76.     Arbitron did not experience difficulties recruiting panelists in Houston (the only MRC accredited market) to the same degree that it did in other markets.  According to CI 1, a former Manager of Panel Compliance Operations, part of the reason was because Arbitron had used field-based panelist recruitment in Houston, which meant that Field Representatives would go door – to – door to personally speak with household members to recruit them for participation in the panel.  In other markets, Arbitron used telephone-based recruitment.  CI 1, a former Manager of Panel Compliance Operations, stated that the telephone-based recruitment was less successful because it was much easier for people to agree on the phone to participate, even though they had no intention of honoring their commitment.  CI 1 also noted that Arbitron had previously employed the field-based

---

[5]     Under the PPM method, panelists were asked to agree to participate in the survey for a period of two years, whereas Diary panelists agreed to participate for one week.

approach prior to its implementation in Houston.  Arbitron's phone-based recruitment, by contrast, was used for the first time in the new markets where rollouts had been scheduled.

77.     Even when Arbitron was able to recruit panelists, the Company experienced problems with panelist compliance.  For example, after a panelist agreed to participate in the PPM survey, they were mailed PPM monitors to wear and PPM equipment that was installed on their home phone line. When a panelist did not install the PPM equipment or did not wear the PPM monitors, they were characterized as being in the "pipeline."  According to CI 6, a former Arbitron employee who held various positions at the Company, at least half of the recruited households were in the pipeline.  CI 1 noted that this presented a huge problem for Arbitron because data could not be received or counted if the panelists did not properly install or wear their equipment.

78.     Often, panelists agreed by phone to participate in the PPM survey but later changed their minds once they received the equipment.  CI 1 estimated that as many as one in every five households in the pipeline backed out or refused to continue as a PPM panelist after equipment was shipped to them.

79.     According to CI 1, sometime around the middle of 2007, when Arbitron was expanding into the top 10 markets, the pipeline became "enormous" and dealing with the households in the pipeline was a "constant battle."  The households in the pipeline were expending a lot of Arbitron's resources, according to CI 1, and Arbitron's Panel Relations Specialists had to continually call the panelists to convince them to wear or install their PPM equipment.  CI 6 confirmed that compliance was a "huge" problem for Arbitron and, in June 2007, the Company had to send Panel Relations Specialists to panelists' homes to try to convince them to install the PPM equipment. According to CI 7, Panelist Relations Specialists were instructed by their supervisors to "do

everything in their power" to convince panelists to use their PPM devices properly, which often meant that Arbitron had to offer additional monetary incentives.

80.      Defendants were well aware of the problems with panelist compliance with the PPM device.  According to CI 7, when a panelist was not wearing or using the PPM device properly, Arbitron would receive a notification.  CI 7, one of many Panelist Relations Specialists responsible for contacting panelists who failed to use the PPM device properly, stated that he contacted about 90 households every day and, within each household, there could be more than one panelist who was not using the device properly.  Defendants would have also known about the recruitment and compliance problems because, according to CI 8, a former PPM Distribution Department Supervisor, Arbitron held meetings specifically to discuss panelist performance and response rates.

81.      Although Arbitron disclosed general problems of recruitment and compliance to investors, the severity and negative impact of these problems and their effect on the rollout schedule for the PPM ratings system were not disclosed at all.  On the contrary, throughout the Class Period, Defendants repeatedly told investors that Arbitron's recruitment and compliance problems would be remedied and that the PPM rollout schedule was "on track" for commercialization.

**Problems with PPM Data Reliability and Methodology**

82.      The recruitment and compliance of a diverse group of panelists was critically important to Arbitron and its customers because without an adequate sample size from each demographic, the results of the PPM surveys would be meaningless.

83.      According to CI 2, the problems with the pipeline compromised the in-tab data. During the Class Period, there were not enough panelists complying with the PPM system, which caused the samples to be too small to provide reliable data.  This caused a problem for Arbitron because it could not commercialize the PPM service if it provided unreliable ratings.

84.     Even without the recruitment and compliance difficulties, the PPM data was also problematic because the target sample sizes of Arbitron's PPM panels were too small.  According to Ceril Shagrin ("Shagrin"), a researcher for Univision Communications specializing in the quality of samples, PPM requires larger sample sizes in order to demonstrate stability of the data and accurate representations of the various populations.

85.     Arbitron did not experience the same data reliability issues with the Diary ratings service.  According to CI 4, a former Senior Bilingual Customer Service Consultant, since there were so many more Diary panelists in comparison to PPM panelists, when a panelist dropped out of or failed to comply with the Diary-based system, the overall data was not affected.  The PPM's sample panels were, on average, 66% smaller than the Diary panels.  CI 4 further stated that there could be as many as 65,000 panelists for a region that used the Diary survey method, while there might only be 2,000 PPM panelists recruited for the same region.  CI 1 also confirmed that the average size of the PPM panel was between 2,000 and 3,000 panelists.

86.     The following chart represents Arbitron's target PPM panel sizes during the Class Period:

| PPM Rollouts | Currency | Panel Size |
| --- | --- | --- |
| Philadelphia | March 2007 | 2040 |
| Houston | June 2007 | 2000 |
| New York | December 2007 | 3720 |
| Los Angeles | March 2008 | 3275 |
| Riverside, CA | March 2008 | 1065 |
| Chicago | March 2008 | 2565 |
| San Francisco | June 2008 | 2245 |
| Dallas/Ft. Worth | September 2008 | 1815 |
| Washington | December 2008 | 1775 |
| Detroit | December 2008 | 1920 |

87.     Shagrin explained that the PPM's small sample sizes fail to provide an accurate reflection of the populations being measured.  She also described the differences between the Diary method and the PPM method during the NYC Council hearing held on September 10, 2007, which called on the FCC to investigate Arbitron and its PPM system.  Shagrin stated, in relevant part, as follows:

> The quarterly diary measurement was an average of 12 different weekly samples; one might have been bad one way, one week might have had a bias the other way, but they averaged twelve different weekly samples.  In PPM, if the sample is not representative, users of the data must live with that sample for a month.

88.     While Arbitron set low targets for its sample panels, an even smaller percentage of these self-imposed target panels provided data that was usable, *i.e.,* "in-tab."  For example, as reflected in the chart above, Arbitron's target panel size for New York was 3720.  However, using Arbitron's target of a 75% in-tab rate for all panelists 6 years and older, only 2790 of those panelists would have to provide usable data for Arbitron to deem the data sufficient.  The target for panelists between the ages of 18-34 was even lower, set at a 60% in-tab rate.  Even with these targets, Arbitron was still unable to meet its own standards.  As Defendant Morris admitted during a hearing with the New York City Council and the Joint Committee on Consumer Affairs, almost a year after Arbitron announced the delay of the PPM rollout, it was still unable to meet its target in-tab rates.  Specifically, Defendant Morris stated that "[i]n New York we've got about 5,000 installed in the panel . . . it may be 5,200.  And on a daily basis we have about 3,600 [or] 3,700 that actually wear the meter."  According to Defendant Morris's numbers, the New York market was averaging an in-tab rate of less than the targeted 75%.

89.     Arbitron's reliance on such small panel sizes left Arbitron with virtually no margin for error in its data collection efforts.  In many cases, Arbitron was providing ratings data based on a panel cell of a single person.  Because Arbitron's target panel sizes were set so low, it was

imperative for Arbitron to achieve high compliance rates to accurately represent the particular market being tested.

90.     According to Shagrin, the noncompliance of panelists also affects the reliability of the PPM data because when Arbitron panelists do not provide usable data for days or months, it leads to a bias in the reported radio data.  Noncompliance affects the Sample Performance Indicator ("SPI"),[6] which is an important statistic for determining the quality of samples.  During the NYC Council hearing, Shagrin made the following statements regarding Arbitron's targets for panelist compliance:

> Arbitron sets its goals too low.  They set an overall standard of 75% of persons six plus providing usable data and 60% of persons 18 to 34.  That means that if 40% don't provide usable data, that's good, that met their standard.  That's not acceptable for currency data.[7]

91.     During the Class Period, Arbitron also experienced problems adhering to its own PPM methodology, which caused the PPM's data to be further compromised.  According to CI 2, Arbitron began removing households from the panel for non-compliance, without first making efforts to obtain compliance or researching the reasons for noncompliance.  CI 2 noted that the methodology required documentation before a household could be removed, and no documentation was created.  CI 2 explained that when panelists were removed without following the proper removal procedures, this had the effect of "playing with the numbers" because the removed households were replaced by one of 25 alternate households.  Arbitron was removing panelists so often that they were quickly moving down the alternate list, such that the data collected came from many different

---

[6]     The SPI is the percentage of panelists that provide usable data on the average day.

[7]     In their May 30, 2007 letter, the MRC noted that they did "not endors[] Arbitron's 'target of a 75% daily in-tab rate.'"

households for short periods of time.  According to CI 2, this practice affected the continuity of the data, making it inaccurate and unreliable since it was not consistently provided by the same source.

92.     According to CI 2, the failure to follow the PPM methodology was equivalent to lying to customers, shareholders and the MRC because the methodology represented to the industry the way that  the data was being collected and ensured its quality.  CI 2 also stated that he/she vocalized his/her concerns to Arbitron superiors and that Defendant Morris and other executives would have been aware of these practices because the PPM was "closely watched" by the executives, including Defendant Morris.

**The PPM System's Underrepresentation
of the 18-34 and Minority Demographics**

93.     Arbitron's difficulty in panelist recruitment was most evident in the PPM survey's 18-34 and minority demographics.  For example, in July and August 2007, Arbitron's panel was only 55% of its target size for the 18-34 demographic.  As reported by Arbitron in its Summer Consultant Fly-in, only 197 individuals aged 18-34 were in the average daily sample, far less than the Company's target of 358.  CI 2 confirmed that it was very difficult meeting Arbitron's own self-established sample size targets for the Black, Hispanic and 18 to 34 demographics and that the actual numbers were "way off."

94.     Because Arbitron could not recruit enough 18-34 year old and minority panelists, the sample size of these demographics was too small to provide reliable data.  According to Shagrin, Arbitron's overall "sample size is so small – that looking at a specific community for a specific station is nearly impossible."  For example, Arbitron's target in-tab rate for African Americans between the ages of 18-34 was 60%, yet Arbitron only sought approximately 100 individuals in this demographic for its panel; therefore only 60 people on any given day during the Class Period

actually submitted usable PPM data.  These 60 people were supposed to represent the listening habits of approximately 629,000 African Americans in the New York market.

95.     Defendants knew or recklessly ignored that, during and prior to the beginning of the Class Period, the PPM ratings system faced significant reliability issues that would delay Arbitron's announced rollout schedule for its PPM system.  Indeed, beginning in 2006 and throughout the Class Period, Arbitron received numerous complaints from radio broadcasting companies, advertising agencies and various organizations.  These groups complained that individuals between the ages of 18-34 and minorities were being underrepresented by the PPM system and that the PPM's methodology was flawed.

96.     Because radio broadcasting companies and advertising agencies lacked confidence in the quality of the PPM radio ratings data, according to CI 10, they were reluctant to move forward with the PPM system in new markets without Arbitron first receiving MRC accreditation. According to CI 5, with the adoption of the PPM survey method, many of Arbitron's customers questioned the size of the PPM panels and whether the panelists adequately represented the demographics of the targeted marketplace.  Arbitron's critics were particularly concerned about sample sizes among the 18-34 and minority demographics.

97.     According to CI 5, customers also questioned the reliability of the PPM method because when Arbitron switched from a Diary-based ratings system to the PPM system, the ratings of many broadcasting companies plummeted.  According to a Bear Stearns analyst, the PPM data indicated that ratings dropped 30 to 50 percent among African American and Hispanic listeners compared with ratings data previously obtained using the Diary system.  Charles M. Warfield Jr. ("Warfield"), President and COO of a minority broadcasting company, confirmed that ratings from the PPM systems drastically declined for stations serving African Americans and Hispanic

audiences.  For example, in Philadelphia, WDAS FM, previously a top rated radio station, suffered a 44.4% decline in its "12 plus"[8] ratings and a 57.1% decline in its primary target demo of adults 25 to 54;  WRNB FM and WUSL FM incurred respective losses of 60% and 57.1% in their 12 plus audience.  In Los Angeles, KGLH FM suffered an 84% audience decline.  In New York, WBLS FM had a 50% decline in 12 plus and a 62.5% decline in its 25 to 54 audience.  While the PPM system showed a decline in ratings for stations targeting minority groups, a similar decline in ratings was not experienced among other radio stations.

98.     Arbitron was pressured by various broadcasting companies to correct the problems with small sample sizes and poor recruitment/compliance rates.  By November, four major radio broadcasters, including Clear Channel, Cox Radio, Cumulus Media and Radio One, grew so frustrated with Arbitron that they sent the Company a letter demanding a solution to the problem within 30 days.  The letter stated, in pertinent part, as follows:

> Gentlemen, It is with the utmost urgency and objection that we, your customers, send you this letter.  All of us have been vocal supporters of the concept of electronic measurement in radio for several years – and we remain committed to the need for accurate, high quality electronic ratings as a way to program and sell our stations.  As of this writing, the PPM system has been implemented in two markets for several months, with one month of information available in New York.  To date, PPM has not provided accurate or reliable data for all demographic groups.
>
> We are calling on you to take immediate action to resolve this.  ***The most immediate issue is sample size – especially with regard to 18-34 year olds and ethnic groups***.  The situation is clear: To secure a legitimate representation of listener activity, the number of people participating in the PPM survey must be increased.  Your recent proposal to lower the number of market-level respondents needed to issue a valid report for a specific demographic is both specious and dangerous.  This proposal could result in some stations doing business based on the activity of as few as a single – one – listener.  ***Your own researchers have concluded that such a sample size "has a greater range of error than the size of the estimate."***  [Emphasis added.]

---

[8]     "12 plus" refers to the demographic for individuals 12 years old and above.

99.     The PPM data was also criticized by various organizations including the National Association of Black Owned Broadcasters ("NABOB"), the National Association for the Advancement of Colored People ("NAACP") and the New York City Council, who complained that the PPM ratings service had an ethnic bias that threatened the future of minority stations.  According to James L. Winston, the executive director of the NABOB, the PPMs were not measuring an adequate sample of African Americans and Hispanics, which put stations with "urban"[9] and Hispanic formats at a disadvantage.  These groups were pressuring Arbitron to reexamine its PPM methodology at least as early as September 2007.

100.    Defendants were aware of these problems long before Arbitron announced that it would be delaying the commercialization of its PPM system.  According to Warfield, broadcasters have been complaining about the PPM's reliability since 2006.  CI 2 confirmed that Arbitron started receiving complaints from its customers before August 2007.  CI 2 was aware of the complaints from emails forwarded to him/her by Defendant Morris, which indicated that broadcasters were concerned that the data was insufficient and inaccurate.  As Arbitron later admitted, these reliability issues and complaints from radio broadcasters and various organizations are what caused Arbitron to delay its plans to launch the PPM ratings service in nine markets, including New York, Los Angeles and Chicago.

101.    According to CI 9, a former Senior Operations Manager, as a direct result of failing to meet the PPM rollout deadlines, there was an increase in meetings of senior management.  CI 9 elaborated that these meetings were typically scheduled weekly and focused on whether Arbitron

---

[9]     "Urban" is used by Arbitron to describe stations that are directed toward an African American audience.

was going to meet its internal rollout deadlines.  CI 9 further stated that Defendant Morris was in attendance for at least two or three of these meetings.

102.    Although Defendants had knowledge of broadcasters' concerns and the questionable PPM methodology, the disclosure of these complaints and the problems with the PPM's reliability were knowingly or recklessly omitted from Arbitron's press releases as well as Defendants' other public statements.

**Shortage of PPM Equipment**

103.    During the Class Period, Arbitron was also experiencing a shortage of PPM equipment, which further led to delays in its aggressive PPM rollout schedule.

104.    According to CI 1, the shortage of PPM equipment became a problem during the New York and Los Angeles recruitment period because panelists often failed to return the PPM equipment.  CI 1 estimated that the problem became more severe during the second quarter of 2007 and by mid-2007, Arbitron was really "hit hard" with shortages.  CI 8 confirmed that many panelists did not return their equipment when they ended their participation in a PPM survey and noted that a large number of panelists lost their PPM monitors.  Accordingly, CI 8 stated that there was an insufficient amount of PPM equipment for the upcoming scheduled rollouts.

**Materially False and Misleading
Statements Made During the Class Period**

105.    The Class Period begins on July 19, 2007.  On that date, Arbitron issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007.  For the quarter, the Company reported revenue of $79.0 million and net income of $3.8 million, or $0.13 per share (diluted).  Defendant Morris, commenting on the results, stated, in pertinent part, as follows:

> Since the end of the 1st quarter, we signed long term contracts for the PPM ratings service with three leading radio groups: Clear Channel, Cox Radio and Entravision

Communications.  ***These contracts, along with the agreements with more than a dozen other major broadcasters and numerous advertising agencies that we had already signed, allow us to focus all our energy on executing the rollout of the PPM ratings service in the top 50 markets.***

***Two markets-Philadelphia and Houston-have already completed the switch to PPM ratings as the currency in the market.  We are also well into the process of installing the PPM service in the three largest and most complex radio markets: New York, Los Angeles and Chicago, and our progress to date has been good.  We are currently on schedule,*** but each market presents its own set of challenges.  It is difficult and exacting work to recruit representative panels of consumers in these extremely diverse markets.  [Emphasis added.]

With regard to the Company's financial outlook, the press release stated in pertinent part as follows:

Arbitron is reiterating its previously issued revenue guidance for the full year 2007 and is updating the earnings per share guidance.

The Company continues to expect that revenue will increase between 5.5 percent and 7.5 percent in 2007 compared to last year.

***Based on recently completed contract negotiations as well as on the Company's current experience with the recruitment and management of the PPM panels in the 2007 and 2008 rollout markets, earnings per share (diluted) is expected to be between $1.35 and $1.45 for the full year 2007.***  This compares to the previous estimate of $1.30 to $1.50 per fully diluted share for 2007.  [Emphasis added].

106.    The statements referenced above in ¶105 that Arbitron was "currently on schedule" to rollout the PPM and that "progress to date has been good" were each materially false and misleading when made because they misrepresented and failed to disclose the following material facts which were known to Defendants or recklessly disregarded by them:

(a)    that the Company's scheduled implementation of its PPM ratings service in certain major markets was not performing according to internal expectations and the Company was experiencing significant difficulties with panelist recruitment and compliance, data reliability, underrepresentation of the 18-34 and minority demographics and PPM equipment shortages such that Arbitron would have to delay the PPM's implementation;

(b)      that the Company was receiving an overwhelming number of complaints from various broadcasters and organizational groups concerning the reliability of the PPM data and its underrepresentation of minorities and individuals between the ages of 18-34;

(c)      that Arbitron had failed to comply with the MRC's Voluntary Code of Conduct by attempting to replace the Diary (an accredited service) without first using its best efforts to obtain accreditation for the PPM service prior to its commercialization;

(d)      that Arbitron's PPM services in Philadelphia violated the MRC's Minimum Standards; and

(e)      as a result, Defendants lacked a reasonable basis for their positive statements about the timing of the implementation of its PPM ratings service and the Company's prospects and future earnings.

107.      Also, on July 19, 2007, Arbitron held a conference call with securities analysts and investors to discuss its second quarter earnings release and the Company's operations.  During the conference call, Defendant Morris spoke positively about the Company's prospects for its PPM rollout, stating in pertinent part as follows:

> But from my perspective, ***the key headline is that we are on track in this trough year of a multi-year investment cycle to support the launch of PPM***.  In February, we provided guidance for the year of revenue at a 5.5 to 7.5 range and EPS at $1.30 to $1.50 range.  We're holding the revenue guidance and we are tightening the range on EPS to $1.35 to $1.45.
>
> *                *                *
>
> The question that I would add, however, is that this is, by historical standards in our industry, a very rapid rollout and we are tackling the biggest and most complex markets first.  When you launch something as new and different as electronic measurements, ***using panels where we are now able to set quality standards down to the personal compliance level***, there's going to be a learning curve executionally.  There's also going to be a multitude of customer concerns as the numbers change for formats and stations and ***we need to deal with each concern carefully and fully, all as part of our ongoing efforts to achieve MRC accreditation.  We are spending the money to get it right in these early markets*** and that means that some of our costs

- 32 -

are above what we had planned for this year and above what I think we will need in the future.  The markets do get easier, we are gaining experience rapidly and we are working to bring automated systems to bear on what is now often manual effort.  ***But the priority is getting it right***.

So on balance, ***we're feeling good about progress in PPM and the underlying tone of the business remains positive.***  It is still a difficult selling environment and we're now dealing with a bit of deconsolidation in the industry.  However, our basic audience data, Scarborough and the software packages that we sell are still essential to programming and to selling a station's inventory and the flipside is true for buyers.

*     *     *

So as you might imagine, ***we are excited about the progress on PPM, and for a lot of years, the patient effort and we're shifting the priority now to a focus on seamless execution***.  We're also going to be looking for ways to leverage our electronic measurement IP to broaden our array of services over time.  On that note, let me hand things over to Sean to add some color to our performance and the outlook.  Sean?  [Emphasis added].

During the conference call, Defendant Creamer reassured analysts and investors that Arbitron's plan to start recruiting panelists earlier in the larger, more challenging markets would act as an "insurance component" to ensure that the PPM service would be implemented according to schedule, stating, in pertinent part, as follows:

Well, in my comments, Troy, I suggested that the trend, which is not at all a surprise, in recruitment remains a challenge across both Diary and PPM and, in fact, across all research companies.  It's increasingly more difficult and therefore more expensive to recruit people to participate.  So clearly that is part of it.  ***But again, don't underestimate the insurance component of these costs and getting people lined up earlier than would otherwise be ideal to make sure that these early markets are being implemented on the timeline we've put out there.***  [Emphasis added.]

108.    The statements above in ¶107 that Arbitron was "on track" with the launch of PPM and felt good about its progress were materially false and misleading because, given the problems that the Company was having with its PPM system and the complaints Arbitron was receiving from broadcasters and various organizational groups, as detailed herein, there was no reasonable basis upon which to state "we're feeling good about progress in PPM and the underlying tone of the business remains positive."   In addition, Defendant Creamer's statement that "the insurance

component of these costs and getting people lined up earlier . . . to make sure that these early markets are being implemented on the timeline" should not be "underestimate[d]" was materially false and misleading because it created the false impression that the problems with the PPM system were limited in scope and Arbitron would be able to easily remedy the problems before the scheduled rollout date.  Defendant Morris's statement that the PPM panels "set quality standards down to the personal compliance level" was also false and misleading because Arbitron experienced problems getting panelists to comply with the PPM system and, as the Ernst & Young audit revealed, approximately one-third of the panelists for the Philadelphia market were found to be noncompliant with the PPM's required procedures.  Moreover, the positive statements about PPM, as noted in ¶107, created an obligation to disclose the problems that the Company was then having with the PPM – including panelist compliance, data reliability, equipment shortages, underrepresentation of certain groups, complaints from broadcasters and others, and failure to comply with the MRC's Minimum Standards.

109.   During the July 19, 2007 conference call, Defendants also downplayed the compliance problems associated with the PPM ratings service.  The following exchange between Troy Mastin, an analyst from William Blair & Co, and Defendant Creamer is illustrative:

> TROY MASTIN:  So can you provide some insight though in terms of retention and if retention is more challenging than you expected for the PPM or is it more challenging than it is for the diary or are those relatively in line with expectations?
>
> SEAN CREAMER:  Well, ***I think we're not too far from expectation.***  The Diary doesn't have a retention issue; you have a response rate.  You send them a diary, they either fill it in or they don't.  Compliance is really a panel question that does not occur in the diary world.  It's a – we had Houston for most of the year and that gave us some pretty good indicators of the kinds of daily in tab.  I don't know to get into the details of the language we used to describe it, but ***you have a group of people that have agreed to participate, and then, of them, a very high percent is successful in installing the information.  We call that an installed household.***  And then of that group of people, there is a percent that on any given day, are in fact carrying their PPMs with them.  And that's what's called a compliance rate.  That's really I think what you are going after.

*And I think our experience in compliance, it is – Houston was a pretty good indicator of how that would go. We got our MRC accreditation of Houston based on kind of a set of metrics that included the compliance that we were able to get. And as we go forward into these new markets, we're tracking at numbers generally the same, but with these demographic hotspots that we're focusing a lot of attention on.* [Emphasis added.]

110.    Defendant Morris made similar statements regarding the PPM's compliance and reliability:

Yes, and ***we keep testing for whether the level of response undermines the statistical validity of the data. And we've done a lot of analysis on this as part of our whole MRC conversation. And we continue to feel comfortable that the levels of compliance and the proof and etc. that we have*** and the level of response rate we get on our Diary service ***continues to support credible reliable data by itself.*** It's a long-term issue. We've got a lot of work to push back against that trend, but ***we are not concerned about the loss of fundamental validity of the numbers***. [Emphasis added.]

111.    The statements referenced above in ¶¶109-110 were materially false and misleading because they misrepresented the extent of Arbitron's PPM compliance problems and improperly compared the accredited PPM service in the Houston market, which, as described above, was based on an entirely different methodology, to the unaccredited PPM service in other markets. In addition, the statement in ¶109 that out of the "group of people that have agreed to participate" in the PPM survey, "a very high percent is successful in installing the information" was materially false because panelists often failed to install or wear the PPM equipment. According to CI 1, approximately one in every five households in the pipeline backed out or refused to continue as a PPM panelist after receiving their equipment. Moreover, the statements in ¶110 regarding the PPM's reliability and the "levels of compliance and the proof" that "continue[] to support credible data" were materially false and misleading because there were significant flaws in the PPM's methodology (identified by the MRC) that affected critical measures of reliability such as compliance.

- 35 -

112.    On August 31, 2007, Defendants sent a letter, which was filed with the SEC, to Arbitron's PPM customers regarding the Company's progress with its PPM service. With regard to panelist recruitment and compliance, the letter stated, in relevant part, as follows:

### Philadelphia and Houston Panel Maintenance

We are not hitting our sample targets in both markets. While sample sizes in Houston and Philadelphia debuted at or close to target, the total panel size dropped over the summer as we introduced a new "tough love" panel-management approach. Instead of trying to coach panelists into better compliance over a period of several months, we now give panelists significantly less time to exhibit good compliance (e.g., take the PPM from its dock in the morning, carry it throughout the day and dock it at night), or the household is removed.

*       *       *

As we began removing panelists at a faster pace, we were unable to recruit and install new panelists quickly enough to offset the loss. As of the July survey, we were 193 panelists short versus our average daily target of 1361 in Houston, and 179 panelists short versus our 1530 average daily target in Philadelphia. That put the July total sample index at 86 in Houston and 88 in Philadelphia.

*       *       *

Let me be clear about one critical point. ***Despite the shortfall in total in-tab, the audience data are statistically reliable, and audience trends from month to month are stable and credible***. When the PPM does show differences in the ratings, clients can be confident that those differences reflect changes in programming or marketing.

*       *       *

### Sample Proportionality

***Sample proportionality in Philadelphia and Houston looks somewhat similar to what we see in the diary service. We are doing well with ethnic groups but poorly with young persons of all races***. Young persons' sample proportionality is especially challenging in Philadelphia, where we have been making slow progress since the beginning of the year. However, we expect to make improvements more quickly over the next few months against these very difficult younger demos. [Emphasis added.]

113.    The statements in ¶112 above that "the audience data are statistically reliable, and audience trends from month to month are stable and credible" were materially false and misleading because they failed to disclose that the PPM service in Philadelphia did not comply with the MRC's

- 36 -

Minimum Standards and that the sample size of the PPM panels was too small to provide statistical reliability.  In addition, the statement in ¶112 that "sample proportionality in Philadelphia and Houston looks somewhat similar to what we see in the diary service" was materially false and misleading because the sample size of PPM panels was much smaller than the sample sizes of Diary panels and Defendants did not experience the same recruitment and compliance problems with the Diary method as it did with the PPM system.  Moreover, the statement in ¶112 that "[w]e are doing well with ethnic groups but poorly with young persons of all races" was materially false and misleading because, as detailed herein, Arbitron experienced difficulties recruiting African American and Hispanic panelists and the sample panels did not adequately represent these groups. The statement was also misleading because Arbitron was using a very low self-imposed target as its benchmark for usable data, *i.e.,* 75% of persons six plus and 60% of persons 18 to 34, which the MRC did not endorse.

114.    On October 18, 2007, Arbitron issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007.  For the quarter, the Company reported revenue of $96.5 million and net income of $17.2 million, or $0.58 per share (diluted). Defendant Morris, commenting on the results, stated, in pertinent part, as follows:

> While the PPM commercialization is both complex and challenging, ***we have been able to stay on track with our ambitious market-by-market rollout schedule for the Portable People Meter ratings service***.  On September 20, we launched the 'pre-currency' survey period in New York and the embedded radio markets of Nassau-Suffolk and Middlesex-Somerset-Union.  ***These three markets are scheduled to convert to Portable People Meter as full 'currency' on December 31***.

> At the same time, we are recruiting consumers for Los Angeles, Riverside, Chicago, San Francisco and San Jose.  While this has been logistically demanding, especially because each market has its own unique characteristics, ***we're committed to converting these markets as scheduled***.  [Emphasis added.]

With regard to the Company's outlook, the press release stated:

Arbitron is reiterating the revenue and earnings per share guidance for the full year 2007, which was provided by the Company on July 19, 2007.

The Company continues to expect that revenue will increase between 5.5 percent and 7.5 percent in 2007 compared to last year. ***Earnings per share (diluted) are expected to be between $1.35 and $1.45 for the full year 2007***. [Emphasis added].

115.     The statements referenced in ¶114 were materially false and misleading for the reasons stated in ¶106 above.

116.     Following the earnings press release, on October 18, 2007, Arbitron held a conference call with analysts and investors.   During the call, Defendant Morris continued to make positive statements about the progress of Arbitron's PPM service and reiterated that the Company was "on track" with its rollout schedule, stating, in relevant part, as follows:

> ***One positive (inaudible) execution has been, while challenging, we have been able to stay on track with our ambitious market-by-market roll-out schedule.  New York goes currency on December 31, with L.A., Chicago and San Francisco being built as we speak for opening early in 2008***.   We're getting ready to begin panel recruitment in an additional top 10 markets for opening later next year.   This has been logistically demanding, and with the new methodology, there has been a lot to learn.   It's a fact of life in this business that each market has its own unique characteristics, and we're taking on the most difficult markets first.
>
> ***In this context, it's encouraging to see the various metrics that we use to manage the panels improving steadily.  From a research data validity standpoint, the audience estimates in the two open markets, Houston and Philly, have been solid from the beginning.***   However, the closer we can get to census precision of sample composition, the more usable the data becomes for in-depth analysis.  ***We've made huge progress in the last few months and particularly in the last six to eight weeks.***  However, as is the case in all research and certainly this is true in our Diary service as well as for PPM, the most difficult recruitment task relates to the 18 to 24 and 25 to 34 age zones.
>
> While (inaudible) these younger sales are much improved, our lower-level of success in getting their cooperation still holds down our compliance rates and reduces our SPI, also known as a sample performance indicator, which is a panel version of what we call response rate in our Diary service.  So while ***we are confident that we are at adequate levels of quality today,*** we know, from long experience, that you can always do better and we're actually committed to continuous improvement.
>
> In the same vein, ***we are also committed to the process of MRC audit and accreditation.***   The Houston Radio Service, as you know, is accredited, but

Philadelphia is not.  New York is scheduled to complete its audit later this month, and the process continues.  [Emphasis added.]

With regard to the rollout schedule for the PPM services in the major markets and panelist compliance with PPM devices, the following exchange took place:

TROY MASTIN:  Okay, good, thanks.  Then you mentioned -- or now you're rolling out in five markets.  You seem to be on track for your plan for '08.  I guess I just want to get an update on how you feel about the time line that you've got out there, if you see any reason why you would consider accelerating or decelerating the time line you've got running out through 2001 or 2012.

STEVE MORRIS:  It's a good question.  I think *we feel pretty darned good.  We laid this time line out, put it up on our Web site over a year ago, I think.*  To be honest, there was a lot we didn't know when we made those decisions about how quickly we could do this.  We knew that we had a learning curve to go up, and we knew that the first markets were the most difficult.  Our customers were very insistent on, you know, you've just got to get into New York, you've got to get into L.A.; that's where so much money gets spent by the big national advertisers.  You just need to get there first.  *We took that challenge, and we committed to the time line and we remain on that time line.  In retrospect, I'm impressed with us that we were able to hold that, because there's been a lot of learning that's had to go on over the last few months to make that possible.  But yes, we're holding it and I think we feel reasonably confident we can stay with it.*

TROY MASTIN:  Okay, good.  Then finally, there's been some discussion about you maybe exploring some alternative technologies to improve compliance rates with your panelists.  Can you kind of give us an update on where you stand with some alternative collection methodologies or devices?

STEVE MORRIS:  Well, first of all, *we're feeling pretty good that the basic PPM device and the methodology that we are using is producing good metrics.*  We did go through a period in the summer when we were churning out a larger number of low performers; we were hitting some to two-year endpoints on (inaudible) Houston respondents that had to be kicked out of the panel because they hit that two-year mark, and we were dealing with the sort of unknown impact of vacations, etc.  There was just a lot of things moving around.  As we came out of August into September, all of the metrics started picking up very strongly.  *So I think we're feeling – and the New York numbers that we talked about last week are looking very good.  Overall size of the panel, that metric, the distribution by ethnicity, black and Hispanic both, look very good in terms of total participation.*  [Emphasis added.]

Defendant Creamer made similar statements about the PPM rollout schedule, stating in pertinent part, as follows:

- 39 -

RICHARD TULLO, ANALYST, SIDOTI & CO LLC:  I have two questions.  My first question is for Sean.  In the press release, you had mentioned that it looks like New York is going to – [book] is going to get delivered on December 31.  Is that a revenue event for the Company?  Is that included in your guidance?

SEAN CREAMER:  Yes to both.  We recognize revenue when a variety of criteria are met, delivery of product being a critical one of those.  ***We have issued the guidance based on where we stand, relative to the roll-outs schedule and our expectations, and we expect to deliver on December 31.***  [Emphasis added.]

117.    The statements in ¶116 above that "we are on track" and "have made huge progress" with the rollout of the PPM system were materially false and misleading because given the problems with the PPM service – *i.e.*, data reliability, shortage of equipment, underrepresentation of certain demographic groups and complaints from customers and others - the Company would not be able to meet its deadline for the rollout of the PPM in certain markets.  Indeed, Defendants later admitted that it was these problems and complaints that caused them to delay the commercialization of the PPM system.  Moreover, the statements in ¶116 that "we're feeling pretty good that the basic PPM device and the methodology that we are using is producing good metrics" and "[o]verall size of the panel, that metric, the distribution by ethnicity, black and Hispanic both, look very good in terms of total participation" were materially false and misleading because while making positive statements about the PPM system, Defendants failed to disclose the full extent of the problems and complaints that the Company was experiencing with the PPM methodology and made these statements despite the fact that the MRC (and others) did not agree.  Finally, Defendants' statement that "we are also committed to the process of MRC audit and accreditation" was materially false and misleading because Arbitron did not use its best efforts to obtain accreditation for the PPM service before commercialization and was, therefore, in violation of the MRC's Voluntary Code of Conduct.

118.    In response to these announcements, over the next five trading days, the price of Arbitron stock rose $5.46 per share, or more than 12%.

- 40 -

119.    From October 22, 2007 to November 19, 2007, Defendant Morris and other Company insiders took advantage of the temporary inflation in the Company's stock by selling 154,334 shares and reaping more than $7.7 million in gross proceeds.

120.    On November 9, 2007, Arbitron issued a response to statements made by the NABOB regarding the PPM service in the New York market, stating, in relevant part, as follows:

> Arbitron's role is to provide valid estimates of audience size and composition for radio.  With random sampling as the basic research platform for measuring, there is never "perfect" measurement, which is why the Media Rating Council ® mandates that the data are always to be described by suppliers like Arbitron as "estimates."
>
> *              *              *
>
> Eight years of market testing and review by many industry research oversight committees have established that PPM does in fact produce more valid audience estimates than the diary, and on that basis Arbitron has moved forward to commercialize. ***The Media Rating Council, which was founded at the behest of the federal government to oversee media research, has accredited PPM in Houston, and has conducted an audit in Philadelphia.  In New York, the audit is underway and is scheduled to be completed this month.***
>
> ***These reviews are conducted by an independent auditor to establish that PPM methodology does not breach any minimum standards of performance.***
>
> ***On the basis of these rigorous reviews by highly qualified research professionals, Arbitron has proceeded with the stepbystep rollout of PPM as a replacement for the diary.***  [Emphasis added.]

121.    The statements in ¶120 were false and misleading because the MRC had already notified Arbitron by letter dated May 30, 2007 that, due to significant design flaws outlined in the Ernst & Young audit, the MRC had concluded that the new PPM methodology fell below the Minimum Standards.  It was, therefore, misleading for Defendants to state that "Arbitron has proceeded with the stepbystep rollout of PPM as a replacement for the diary" based on the "rigorous reviews" of the MRC.  Moreover, the press release failed to disclose that the Company employs a different methodology for its PPM service in Houston than in any other market and that the

telephone-based methodology used in other markets has produced lower levels of response rates and compliance.

### The Truth Begins to Emerge

122.    On November 26, 2007, after the market closed, Arbitron shocked its investors when it issued a press release announcing that "it will delay the commercialization of its Portable People Meter (PPM) radio ratings service in nine markets."   According to the press release, New York, Nassau-Suffolk and Middlesex-Somerset-Union would be delayed by nine months; Los Angeles, Riverside and Chicago would be delayed by six months; and San Francisco, San Jose and Dallas by three months.  Admitting that its sample sizes among minorities and 18-34 year-olds were not up to standard, Arbitron stated that, "***over the past three weeks, feedback from [Arbitron's] customers, the Media Rating Council and other constituencies has led [Arbitron] to conclude that the radio industry would be better served if [the Company] were to delay further commercialization of the PPM in order to address their issues.***"   [Emphasis added.]  The Company also announced that it would be revising its financial guidance for 2007 and outlook for 2008.  With regard to the Company's outlook, the press release stated:

> Revised Financial Guidance for 2007 and Outlook for 2008
>
> As a result of its decision to delay further implementation of the Portable People Meter service, the Company is updating its previously issued guidance to reflect the resultant financial impact.  ***Earnings per share (diluted) for 2007 are currently estimated to be between $1.30 and $1.35 as compared to its previously issued earnings per share guidance of $1.35 to $1.45.***
>
> In addition, the Company currently estimates the impact of foregone revenue and additional costs required to produce diary estimates in the affected markets will reduce 2008 earnings by $0.22 to $0.33 per share (diluted).  Consistent with past practices, detailed annual revenue and earnings per share guidance will be provided in conjunction with our fourth quarter 2007 earnings release expected to be issued in February 2008.  [Emphasis added].

123.     Analysts were shocked by Arbitron's delay of the PPM rollout.  An analyst at Bear Stearns stated that they were "surprised to see that Arbitron has given into industry pressures and delayed the rollout in these five major markets after reiterating such confidence in the process just last month on its Q3 earnings call."  Similarly, an analyst at CL King & Associates noted that "[t]he announced delay of the Portable People Meter (PPM) to the next five major markets was a surprise to all."  An article by the *Associated Press* stated that Arbitron's announcement of delays "came as a surprise to many" and quoted the Senior Vice President Market Manager of Emmis Communications Inc. as stating that he was "flabbergasted" by the delays because "we felt every sign from them was they were working through these challenges."

124.     In response to the November 26, 2007 announcement, on the next trading day, the price of Arbitron common stock declined $7.21 per share, or over 14.74%, to close at $41.70 per share, on unusually high trading volume.

125.     The next day, on November 27, 2007, Arbitron held a conference call with investors and securities analysts to discuss Arbitron's decision to delay the rollout of the PPM ratings system in various markets.  On the conference call, Defendant Morris admitted that there were major problems with the PPM system that delayed its rollout, stating, in relevant part, as follows:

> ***These concerns have been particularly acute for ethnic formats***, where shares decline the most between diaries and PPM.  And ***there have been concerns that our recruitment methods do not adequately attract the right mix numbers of listeners to those formats to properly measure their true audience***.

> We believe that we are in fact doing a good job in terms of recruitment at the total sample level.  However, ***there is more work that we can do in terms of getting approved representation among young persons aged 18 to 34, including black and Hispanic young adults***.  I think there is a great opportunity to work directly with the African-American and Hispanic communities to develop even better compliance methods.  ***Again with New York commercializing December 31, there would not have been enough time to properly address those concerns and the delay should prove highly productive on this front***.  [Emphasis added.]

- 43 -

Defendant Morris also admitted that he was aware of the problems associated with the PPM ratings service and the concerns that broadcasters and others were having about the accuracy of the PPM data.  The following exchange is illustrative:

> MARK BACURIN, ANALYST, ROBERT W. BAIRD:  Maybe just one final one. Steve, you guys have spent a lot of time testing this in Philly and Houston and felt comfortable enough with commercializing those markets that you've gotten through the main issues.  So what in your mind has caused the broadcasters to come back with this new set of concerns?  Presumably these are all things that were vetted in the original testing process and so I'm just kind of curious why now these issues are coming to light when you presumably addressed all of these in the Houston and Philly tests originally?

> STEVE MORRIS: Well, you know, there are a lot of these issues are magnified tremendously when you start to roll out the largest markets and there were certainly were plenty of issues in Houston and Philadelphia, but when you start talking about taking all of those up to New York and Los Angeles, in these huge markets that have enormous importance in the total radio business, it changes the tenor of the conversation.  And that – *all of these things we're talking about in terms of things we're working with the MRC on, things we are working with the ethnic broadcasters, and NABOB and city council and some of the things with the general market broadcasters have been sending us letters about and talking about in the trade press.*

> *All of those things – none of them are new, but they kind of escalated as the last few weeks came along and some part of that I think was just this kind of impending New York opening, which was going to kick the whole level up quite dramatically in terms of its economics.  So I think that none of these issues are brand-new, but they just escalated quite dramatically in the most recent past.* [Emphasis added.]

126.    While Defendant Morris admitted that the MRC's objections to the PPM service were not "new" issues, in an internal email, Defendant Morris also stated that he did not disclose the full extent of the MRC's concerns with the PPM methodology during the November 27 conference call. The email specified that "we did not want to open up all the MRC issues and the fact that there was a battle shaping up there that we believed we could not win given the pace of new market openings."

127.    On November 27, 2007, the New York City Council issued a press release in response to Arbitron's announcement.  According to the press release, Arbitron had been aware of

the Council's concerns regarding PPM inaccuracies since at least September 2007.  The press release

stated, in relevant part:

> Arbitron Inc. has agreed to delay the release of the Portable People Meters (PPM)
> after ***meeting with the Council and other interested parties for the past two months.***
> The PPMs caused outrage in many communities because of possible inaccuracies in
> methodology that would have resulted in the closing of many minority-owned radio
> stations in New York City.
>
> *        *        *
>
> ***Over the last two months, this partnership has put pressure on Arbitron to***
> ***reexamine its methodology before minority-owned stations were irreparably***
> ***damaged by inaccurate representations of listenership***.  This practice would have
> had a negative affect on advertising revenues.  PPMs essentially hamstring the ability
> of smaller stations to stay afloat in a competitive media landscape.  In fact, in
> Houston and Philadelphia, the usage of PPMs has been disastrous for minority-
> owned radio stations.  In New York City, initial results for the new rating system
> showed a severe drop in ratings for some of most popular stations, with some
> dropping as much as 12 spots on the ranking list.  [Emphasis added].

128.    Today, Arbitron trades at approximately $23 per share.

## Post Class Period Disclosures

129.    On February 28, 2008, the MRC issued a press release announcing that it would not

be granting accreditation to the PPM ratings service in Philadelphia and New York, thereby

indicating a flawed and problematic methodology.  The MRC made the following statements with

regard to its decision:

> Independent external audits of the Philadelphia and New York PPM Services were
> completed during 2007 and an MRC audit committee, comprised of MRC members
> representing a large number of users of the PPM services, including radio stations
> and groups, advertisers, agencies, and trade associations, met on multiple occasions
> to review and discuss the results of the audits.  Additionally, Arbitron subsequently
> interacted with the audit committee to respond to audit questions and audit
> committee concerns.
>
> After careful consideration of the available information, the audit committee voted
> not to grant accreditation to the Philadelphia and New York PPM Services at this
> time and to conclude the 2007 audits.  Moving forward the MRC will be assessing
> the impact of Arbitron's planned initiatives for improving panel results in these
> markets to eventually enable successful completion of the accreditation process.  As

part of the accreditation process a new audit will be required in 2008.  These conclusions were recently ratified by both the MRC Radio Committee and the MRC Board of Directors.

130.     On July 29, 2008, the MRC Executive Director and CEO, George Ivie, stated that the MRC has "important ongoing concerns" about the implementation details of the PPM measurement system.  Particularly, "two key measurement issues:  response rates and panelist compliance with the PPM technique."

131.     On September 2, 2008, the Association of Hispanic Advertising Agencies ("AHAA"), the NABOB, the Spanish Radio Association and five radio broadcasters, including Border Media, Entravision, Univision, SBS and Inner City, filed an emergency petition under Section 403 of the Communications Act asking the FCC to investigate the accuracy of Arbitron's PPM methodology. The petition claims that an emergency investigation is the only way the FCC can "shed light on the methodological problems identified in early PPM markets and avert harm to minority broadcasters from a rollout of PPM with a flawed methodology that undercounts minority audiences."

132.     On September 10, 2008, the New York City Council and the Joint Committee on Consumer Affairs and Civil Rights held a hearing calling on the FCC to investigate Arbitron and its PPM system.  During the hearing, various council members expressed their concerns about Arbitron and its use of the PPM system.  For example, one of the council members stated, in relevant part, as follows:

> I almost feel like we're being strung along, in the sense that when you have an MRC, when you have an FCC, these are two entities within this system that are highly regarded and that have something to say, and you think we would listen.  When those entities, on top of what we've been raising as concerns, are saying that we are troubled or there are questions that have to be answered and Arbitron just flies in the face of that and continues to proceed without seriously addressing it; you have to wonder what ultimately is your goal.

The hearing also gave minority broadcasters the opportunity to voice their frustrations with the PPM system.  For example, Charles M. Warfield, Jr., President and COO of ICBC Broadcast Holdings,

Inc., a minority broadcast company, expressed what he thought were some of the problems with the PPM including, "inexplicable variances between the data provided by the PPM and the data provided in the Arbitron Diary system; lack of MRC accreditation; difficulty in recruiting and an inability to maintain the size of the sample panels in the 18 to 34 demo, particularly in the African Americans and Hispanics 18 to 24; disproportionately small sample panels for minority."  Warfield also considered the PPM's data problematic because "[i]nitial results from the PPM systems have shown drastic declines in the audience for stations serving African Americans and Hispanic audiences" which could "result in huge financial losses for radio stations serving the Black and Hispanic audiences" and "might even force some stations out of business."  Another concerned broadcaster, Ceril Shagrin, Executive Vice President of the Corporate Research Division for Univision Communications, detailed her concerns regarding the PPM's reliability, stating:

> I am a researcher and my focus is the quality of the sample.  This is not a question of the viability of electronic measurement.  My background is in audience measurement research, and I'd like to use my time today to provide the Council with my analysis of why Arbitron's proposed new system risks inaccurately counting Hispanic listeners. . . .  It's therefore very important for outside observers, including this city council, to play an oversight role, making sure that Arbitron is putting the interests of the viewing public first and making the necessary investments to ensure that its numbers are as accurate as possible.  Unfortunately in this case Arbitron is falling far short of that standard, and I'd like to explain precisely why that is.  Regardless of the media measured, certain standards must be met to ensure accurate measurement.  A primary measure of quality is response rate.  The response rate lets the user know what percent of the originally selected homes and persons agree to participate in the sample.  Not all persons agree to participate in a research sample.  Those who agree and those who do not agree are not the same, and they may not consume media in the same way. . . .  Arbitron doesn't collect or share enough information about their samples to know if participants are representative. . . .  Once a person agrees to be in the panel, they need to provide usable data.  Not everybody provides usable data every day.  The percent of Hispanic persons providing usable data is another quality measure. . . .  Too many young Spanish dominant panelists are not providing usable data for ten or more days in the months.  That leads to a bias in the reported radio data. . . .  Sample size in PPM is smaller than the diary service, which limits the way the data can be used.  And Arbitron talked about how advertisers can look at a specific community.  But the sample size is so small – that looking at a specific community for a specific station is nearly impossible.

Frank Flores, Vice President and Market Manager for Spanish broadcasting systems in New York discussed Arbitron's refusal to acknowledge problems with the PPM's reliability, despite changes made to the system stating, in relevant part, as follows:

> And furthermore, in some of the meetings that we've had with them, in fact, the very first meeting that the Spanish Radio Association had with them, one question was asked of them, and I asked the question.  And the question was simple, do you believe that you have a problem, as the way we're looking at it, because the people on our side of the table believe you have a problem.  Their answer at that point, which was six or seven months ago, the answer was no.  All of a sudden, in the last six or seven months, cell phone only households, sample size redirection, panelists, more attention to panels configuration; all of these things are coming about in the last couple of months.  Well if all of a sudden those seem to be issues now, then obviously you're not ready to roll this out.  Because if you were so sure six or seven months ago there was nothing wrong and now there's something wrong; then why roll it out?

133.  Defendant Morris also testified during the September 10, 2008 hearing.  During the hearing, Morris stated that "Arbitron adheres to the Voluntary Code of Conduct of the MRC."  He also admitted that Defendants decided to delay the rollout of the PPM ratings system "[a]t the time we had our conversation with the [New York City] Council last fall."  Arbitron's discussions with the New York City Council occurred in early October 2007.  However, it was not until almost two months after deciding to delay, that Arbitron made its decision public.  Defendant Morris also admitted that, during the Class Period, the PPM was doing very poorly in terms of representing the 18-34 age groups, especially within the African American and Hispanic groups.

134.  On October 9, 2008, Arbitron and certain of its executive officers received subpoenas from the New York Attorney General regarding the commercialization of the PPM radio ratings service in New York and purchases and sales of Arbitron securities by those executive officers.  Upon information and belief, that investigation is still continuing.

135.  On October 10, 2008, the Attorneys General of New York and New Jersey commenced civil actions against Arbitron, alleging false advertising and deceptive business practices

relating to the marketing and commercialization of the Company's PPM service. Among other things, the Attorneys General alleged that Arbitron failed to disclose important flaws in the PPM methodology to broadcasters, advertisers, shareholders and the public, including serious shortcomings in the accuracy of the new system and its inadequate representation of minorities.

136.    On January 7, 2009, Arbitron entered into consent decrees in connection with the actions brought by the Attorneys General of New York and New Jersey. As part of the settlement, Arbitron was required to pay a total of $490,000 to the states of New York and New Jersey, the NABOB and the Spanish Radio Association and agreed to take a number of actions to improve the PPM service, including making all reasonable efforts to obtain and retain MRC accreditation in the New York and Philadelphia markets. The settlements, however, do not affect the subpoena Arbitron received on October 9, 2008.

137.    On February 6, 2009, Arbitron entered into a similar settlement agreement with the Office of the Attorney General of Maryland regarding the Company's PPM services in the Washington, DC and Baltimore markets.

138.    In June 2009, the U.S. House of Representatives Committee on Oversight and Government Reform (the "Committee") opened an investigation into Arbitron's PPM service. As part of the investigation, the Committee subpoenaed the MRC for documents detailing its oversight of Arbitron's use of the PPM. After reviewing the MRC documents, Congressman Edolphus Towns, Chairman of the Committee, said the MRC found "persistent problems" with Arbitron's minority sample audiences across the country. The documents also showed that Arbitron's radio ratings were almost consistently based on data they received from an unacceptably low percentage of their sample audiences.

139.     Then on July 14, 2009, the Florida Attorney General brought suit against Arbitron for consumer fraud relating to the marketing and commercialization of Arbitron's PPM service in Florida.

140.     On October 2, 2009, Arbitron issued a press release announcing that it would increase the sizes of its sample audience for the PPM system by 10% over the next two years, following criticism from broadcasters that the samples were too small to give an accurate reading.

141.     The market for Arbitron common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Arbitron common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Arbitron common stock relying upon the integrity of the market price of Arbitron's common stock and market information relating to Arbitron, and have been damaged thereby.

142.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Arbitron common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

143.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Arbitron's business, prospects and operations.  These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of Arbitron and its business, prospects and operations, thus causing the price of Arbitron common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Arbitron common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

144.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Arbitron, their control over, and/or receipt and/or modification of Arbitron's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Arbitron, participated in the fraudulent scheme alleged herein.

145.    Defendants' scienter is evidenced by their unusual and suspicious insider trading. Individual Defendants and other Company insiders took advantage of the inflation in the price of Arbitron's stock resulting from Defendants' false statements and sold 178,879 shares of their personally-held Arbitron common stock for gross proceeds in excess of $8.9 million.  The non-Defendant inside traders were all high-level executives during the Class Period.  For example, Pierre Bouvard, who sold more than 40% of his holdings during the Class Period was President of Sales and Marketing and responsible for commercializing the PPM service; Owen Charlebois was

President of Technology, Research and Development; Linda Dupree, who sold more than 60% of her holdings during the Class Period was Executive Vice President of New Product Development, PPM; Vaughan Henry was, and is, Executive Vice President and Chief Information Officer; and Kathleen Ross was, and is, Executive Vice President and Chief Administrative Officer. These individuals were involved with the commercialization of the PPM and would have knowledge about the delay. According to CI 5, the decision to delay the rollout was made by Pierre Bouvard, Owen Charlebois, Vaughan Henry and Defendants Morris and Creamer. The following chart sets forth the insider trading:

| Last Name | First Name | Date | Shares | Price | Proceeds | Percent of Shares Sold |
|---|---|---|---|---|---|---|
| BOUVARD | PIERRE | 9/21/2007 | 900 | $46.40 | $41,760 | |
| (President of Sales and Marketing) | | 9/21/2007 | 300 | $46.59 | $13,977 | |
| | | 9/21/2007 | 200 | $46.35 | $9,270 | |
| | | 9/21/2007 | 100 | $46.33 | $4,633 | |
| | | 9/21/2007 | 100 | $46.36 | $4,636 | |
| | | 9/21/2007 | 100 | $46.38 | $4,638 | |
| | | 9/21/2007 | 100 | $46.39 | $4,639 | |
| | | 9/21/2007 | 100 | $46.46 | $4,646 | |
| | | 9/21/2007 | 100 | $46.42 | $4,642 | |
| | | 10/22/2007 | 9,817 | $50.00 | $490,850 | |
| | | 10/22/2007 | 2,736 | $50.02 | $136,855 | |
| | | 10/22/2007 | 1,500 | $50.01 | $75,015 | |
| | | 10/22/2007 | 1,400 | $50.03 | $70,042 | |
| | | 10/22/2007 | 900 | $50.13 | $45,117 | |
| | | 10/22/2007 | 700 | $50.15 | $35,105 | |
| | | 10/22/2007 | 600 | $50.05 | $30,030 | |
| | | 10/22/2007 | 500 | $50.11 | $25,055 | |
| | | 10/22/2007 | 400 | $50.22 | $20,088 | |
| | | 10/22/2007 | 393 | $50.09 | $19,685 | |
| | | 10/22/2007 | 300 | $50.08 | $15,024 | |
| | | 10/22/2007 | 300 | $50.21 | $15,063 | |
| | | 10/22/2007 | 200 | $50.04 | $10,008 | |
| | | 10/22/2007 | 200 | $50.14 | $10,028 | |
| | | 10/22/2007 | 100 | $50.07 | $5,007 | |
| | | 10/22/2007 | 100 | $50.10 | $5,010 | |
| | | 10/22/2007 | 100 | $50.12 | $5,012 | |
| | | 10/22/2007 | 100 | $50.18 | $5,018 | |
| | | 10/22/2007 | 100 | $50.19 | $5,019 | |
| | | 10/22/2007 | 100 | $50.20 | $5,020 | |
| | | 10/22/2007 | 7 | $50.09 | $351 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | Percent of Shares Sold |
|-----------|-----------|------|--------|-------|----------|----------------|
| | | 10/24/2007 | 500 | $51.02 | $25,510 | |
| | | 11/13/2007 | 1,253 | $51.29 | $64,266 | |
| | | 11/13/2007 | 1,000 | $51.64 | $51,640 | |
| | | 11/13/2007 | 1,000 | $51.27 | $51,270 | |
| | | 11/13/2007 | 800 | $51.48 | $41,184 | |
| | | 11/13/2007 | 800 | $51.42 | $41,136 | |
| | | 11/13/2007 | 700 | $51.82 | $36,274 | |
| | | 11/13/2007 | 700 | $51.28 | $35,896 | |
| | | 11/13/2007 | 700 | $51.44 | $36,008 | |
| | | 11/13/2007 | 600 | $51.55 | $30,930 | |
| | | 11/13/2007 | 500 | $51.49 | $25,745 | |
| | | 11/13/2007 | 500 | $51.63 | $25,815 | |
| | | 11/13/2007 | 500 | $51.70 | $25,850 | |
| | | 11/13/2007 | 500 | $51.30 | $25,650 | |
| | | 11/13/2007 | 500 | $51.46 | $25,730 | |
| | | 11/13/2007 | 400 | $51.53 | $20,612 | |
| | | 11/13/2007 | 400 | $51.56 | $20,624 | |
| | | 11/13/2007 | 400 | $51.59 | $20,636 | |
| | | 11/13/2007 | 400 | $51.65 | $20,660 | |
| | | 11/13/2007 | 400 | $51.76 | $20,704 | |
| | | 11/13/2007 | 400 | $51.22 | $20,488 | |
| | | 11/13/2007 | 400 | $51.33 | $20,532 | |
| | | 11/13/2007 | 400 | $51.37 | $20,548 | |
| | | 11/13/2007 | 400 | $51.39 | $20,556 | |
| | | 11/13/2007 | 300 | $51.50 | $15,450 | |
| | | 11/13/2007 | 300 | $51.71 | $15,513 | |
| | | 11/13/2007 | 300 | $51.16 | $15,348 | |
| | | 11/13/2007 | 300 | $51.21 | $15,363 | |
| | | 11/13/2007 | 300 | $51.25 | $15,375 | |
| | | 11/13/2007 | 300 | $51.26 | $15,378 | |
| | | 11/13/2007 | 300 | $51.41 | $15,423 | |
| | | 11/13/2007 | 300 | $51.43 | $15,429 | |
| | | 11/13/2007 | 200 | $51.47 | $10,294 | |
| | | 11/13/2007 | 200 | $51.60 | $10,320 | |
| | | 11/13/2007 | 200 | $51.66 | $10,332 | |
| | | 11/13/2007 | 200 | $51.72 | $10,344 | |
| | | 11/13/2007 | 200 | $51.73 | $10,346 | |
| | | 11/13/2007 | 200 | $51.78 | $10,356 | |
| | | 11/13/2007 | 200 | $51.79 | $10,358 | |
| | | 11/13/2007 | 200 | $51.05 | $10,210 | |
| | | 11/13/2007 | 200 | $51.19 | $10,238 | |
| | | 11/13/2007 | 200 | $51.23 | $10,246 | |
| | | 11/13/2007 | 200 | $51.24 | $10,248 | |
| | | 11/13/2007 | 200 | $51.34 | $10,268 | |
| | | 11/13/2007 | 200 | $51.36 | $10,272 | |
| | | 11/13/2007 | 200 | $51.45 | $10,290 | |
| | | 11/13/2007 | 100 | $51.51 | $5,151 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | Percent of Shares Sold |
|---|---|---|---|---|---|---|
| | | 11/13/2007 | 100 | $51.54 | $5,154 | |
| | | 11/13/2007 | 100 | $51.57 | $5,157 | |
| | | 11/13/2007 | 100 | $51.57 | $5,157 | |
| | | 11/13/2007 | 100 | $51.58 | $5,158 | |
| | | 11/13/2007 | 100 | $51.61 | $5,161 | |
| | | 11/13/2007 | 100 | $51.62 | $5,162 | |
| | | 11/13/2007 | 100 | $51.74 | $5,174 | |
| | | 11/13/2007 | 100 | $51.31 | $5,131 | |
| | | 11/13/2007 | 100 | $51.32 | $5,132 | |
| | | 11/13/2007 | 100 | $51.39 | $5,139 | |
| | | 11/13/2007 | 100 | $51.40 | $5,140 | |
| | | 11/14/2007 | 255 | $52.00 | $13,260 | |
| | | 11/16/2007 | 700 | $52.00 | $36,400 | |
| | | 11/16/2007 | 100 | $52.02 | $5,202 | |
| | | 11/16/2007 | 100 | $52.05 | $5,205 | |
| | | 11/19/2007 | 3,000 | $52.00 | $156,000 | |
| | | 11/19/2007 | 300 | $52.01 | $15,603 | |
| | | 11/19/2007 | 200 | $52.02 | $10,404 | |
| | | 11/19/2007 | 100 | $52.03 | $5,203 | |
| | | | 47,861 | | $2,426,001 | 40.3% |
| | | | | | | |
| CHARLEBOIS (President of Technology, Research and Development) | OWEN | 10/24/2007 | 7,200 | $50.00 | $360,000 | |
| | | 10/24/2007 | 4,500 | $50.20 | $225,900 | |
| | | 10/24/2007 | 4,400 | $50.25 | $221,100 | |
| | | 10/24/2007 | 1,800 | $50.14 | $90,252 | |
| | | 10/24/2007 | 1,000 | $50.40 | $50,400 | |
| | | 10/24/2007 | 900 | $50.11 | $45,099 | |
| | | 10/24/2007 | 900 | $50.32 | $45,288 | |
| | | 10/24/2007 | 800 | $50.16 | $40,128 | |
| | | 10/24/2007 | 800 | $50.68 | $40,544 | |
| | | 10/24/2007 | 700 | $50.13 | $35,091 | |
| | | 10/24/2007 | 600 | $50.67 | $30,402 | |
| | | 10/24/2007 | 500 | $50.09 | $25,045 | |
| | | 10/24/2007 | 500 | $50.50 | $25,250 | |
| | | 10/24/2007 | 500 | $50.65 | $25,325 | |
| | | 10/24/2007 | 400 | $50.36 | $20,144 | |
| | | 10/24/2007 | 400 | $50.48 | $20,192 | |
| | | 10/24/2007 | 400 | $50.64 | $20,256 | |
| | | 10/24/2007 | 300 | $50.10 | $15,030 | |
| | | 10/24/2007 | 300 | $50.18 | $15,054 | |
| | | 10/24/2007 | 300 | $50.33 | $15,099 | |
| | | 10/24/2007 | 300 | $50.35 | $15,105 | |
| | | 10/24/2007 | 200 | $50.15 | $10,030 | |
| | | 10/24/2007 | 200 | $50.34 | $10,068 | |
| | | 10/24/2007 | 200 | $50.66 | $10,132 | |
| | | 10/24/2007 | 200 | $50.70 | $10,140 | |
| | | 10/24/2007 | 200 | $50.73 | $10,146 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | Percent of Shares Sold |
|---|---|---|---|---|---|---|
| | | 10/24/2007 | 100 | $50.02 | $5,002 | |
| | | 10/24/2007 | 100 | $50.12 | $5,012 | |
| | | 10/24/2007 | 100 | $50.31 | $5,031 | |
| | | 10/24/2007 | 100 | $50.37 | $5,037 | |
| | | 10/24/2007 | 100 | $50.69 | $5,069 | |
| | | 10/24/2007 | 100 | $50.71 | $5,071 | |
| | | 10/24/2007 | 100 | $50.72 | $5,072 | |
| | | 10/24/2007 | 100 | $50.77 | $5,077 | |
| | | 10/24/2007 | 100 | $50.79 | $5,079 | |
| | | 10/25/2007 | 2,700 | $50.00 | $135,000 | |
| | | 10/25/2007 | 1,200 | $50.52 | $60,624 | |
| | | 10/25/2007 | 1,100 | $50.09 | $55,099 | |
| | | 10/25/2007 | 900 | $50.51 | $45,459 | |
| | | 10/25/2007 | 800 | $50.15 | $40,120 | |
| | | 10/25/2007 | 600 | $50.23 | $30,138 | |
| | | 10/25/2007 | 400 | $50.40 | $20,160 | |
| | | 10/25/2007 | 400 | $50.42 | $20,168 | |
| | | 10/25/2007 | 300 | $49.55 | $14,865 | |
| | | 10/25/2007 | 300 | $50.16 | $15,048 | |
| | | 10/25/2007 | 300 | $50.17 | $15,051 | |
| | | 10/25/2007 | 200 | $50.12 | $10,024 | |
| | | 10/25/2007 | 200 | $50.27 | $10,054 | |
| | | 10/25/2007 | 200 | $50.31 | $10,062 | |
| | | 10/25/2007 | 200 | $50.44 | $10,088 | |
| | | 10/25/2007 | 100 | $49.75 | $4,975 | |
| | | 10/25/2007 | 100 | $50.07 | $5,007 | |
| | | 10/25/2007 | 100 | $50.10 | $5,010 | |
| | | 10/25/2007 | 100 | $50.11 | $5,011 | |
| | | 10/25/2007 | 100 | $50.14 | $5,014 | |
| | | 10/25/2007 | 100 | $50.16 | $5,016 | |
| | | 10/25/2007 | 100 | $50.28 | $5,028 | |
| | | 10/25/2007 | 100 | $50.50 | $5,050 | |
| | | | 40,000 | | $2,008,741 | 21.9% |
| CREAMER | SEAN | 9/17/2007 | 373 | $45.32 | $16,904 | |
| (Chief Financial Officer) | | | 373 | | $16,904 | 0.7% |
| DUPREE | LINDA | 10/29/2007 | 1,401 | $50.41 | $70,624 | |
| (Executive Vice President of New Product Development, PPM) | | 10/29/2007 | 1,300 | $49.71 | $64,623 | |
| | | 10/29/2007 | 1,200 | $49.70 | $59,640 | |
| | | 10/29/2007 | 1,029 | $49.87 | $51,316 | |
| | | 10/29/2007 | 800 | $49.49 | $39,592 | |
| | | 10/29/2007 | 800 | $49.56 | $39,648 | |
| | | 10/29/2007 | 600 | $49.41 | $29,646 | |
| | | 10/29/2007 | 600 | $49.45 | $29,670 | |
| | | 10/29/2007 | 600 | $49.46 | $29,676 | |
| | | 10/29/2007 | 600 | $49.69 | $29,814 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | Percent of Shares Sold |
|---|---|---|---|---|---|---|
| | | 10/29/2007 | 600 | $49.77 | $29,862 | |
| | | 10/29/2007 | 523 | $49.79 | $26,040 | |
| | | 10/29/2007 | 500 | $49.38 | $24,690 | |
| | | 10/29/2007 | 500 | $49.48 | $24,740 | |
| | | 10/29/2007 | 500 | $49.52 | $24,760 | |
| | | 10/29/2007 | 500 | $49.54 | $24,770 | |
| | | 10/29/2007 | 471 | $49.86 | $23,484 | |
| | | 10/29/2007 | 434 | $49.47 | $21,470 | |
| | | 10/29/2007 | 400 | $49.39 | $19,756 | |
| | | 10/29/2007 | 400 | $49.62 | $19,848 | |
| | | 10/29/2007 | 400 | $49.78 | $19,912 | |
| | | 10/29/2007 | 400 | $50.18 | $20,072 | |
| | | 10/29/2007 | 334 | $49.68 | $16,593 | |
| | | 10/29/2007 | 300 | $49.37 | $14,811 | |
| | | 10/29/2007 | 300 | $49.42 | $14,826 | |
| | | 10/29/2007 | 300 | $49.51 | $14,853 | |
| | | 10/29/2007 | 300 | $49.55 | $14,865 | |
| | | 10/29/2007 | 234 | $50.03 | $11,707 | |
| | | 10/29/2007 | 200 | $49.57 | $9,914 | |
| | | 10/29/2007 | 200 | $49.67 | $9,934 | |
| | | 10/29/2007 | 200 | $49.72 | $9,944 | |
| | | 10/29/2007 | 200 | $49.80 | $9,960 | |
| | | 10/29/2007 | 200 | $49.82 | $9,964 | |
| | | 10/29/2007 | 200 | $49.95 | $9,990 | |
| | | 10/29/2007 | 200 | $49.97 | $9,994 | |
| | | 10/29/2007 | 200 | $50.59 | $10,118 | |
| | | 10/29/2007 | 200 | $50.62 | $10,124 | |
| | | 10/29/2007 | 200 | $50.64 | $10,128 | |
| | | 10/29/2007 | 200 | $50.68 | $10,136 | |
| | | 10/29/2007 | 134 | $49.81 | $6,675 | |
| | | 10/29/2007 | 133 | $49.43 | $6,574 | |
| | | 10/29/2007 | 100 | $49.36 | $4,936 | |
| | | 10/29/2007 | 100 | $49.40 | $4,940 | |
| | | 10/29/2007 | 100 | $49.50 | $4,950 | |
| | | 10/29/2007 | 100 | $49.59 | $4,959 | |
| | | 10/29/2007 | 100 | $49.60 | $4,960 | |
| | | 10/29/2007 | 100 | $49.83 | $4,983 | |
| | | 10/29/2007 | 100 | $49.85 | $4,985 | |
| | | 10/29/2007 | 100 | $49.90 | $4,990 | |
| | | 10/29/2007 | 100 | $49.91 | $4,991 | |
| | | 10/29/2007 | 100 | $49.93 | $4,993 | |
| | | 10/29/2007 | 100 | $50.05 | $5,005 | |
| | | 10/29/2007 | 100 | $50.08 | $5,008 | |
| | | 10/29/2007 | 100 | $50.12 | $5,012 | |
| | | 10/29/2007 | 100 | $50.22 | $5,022 | |
| | | 10/29/2007 | 100 | $50.26 | $5,026 | |
| | | 10/29/2007 | 100 | $50.29 | $5,029 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | Percent of Shares Sold |
|---|---|---|---|---|---|---|
| | | 10/29/2007 | 100 | $50.43 | $5,043 | |
| | | 10/29/2007 | 100 | $50.50 | $5,050 | |
| | | 10/29/2007 | 100 | $50.61 | $5,061 | |
| | | 10/29/2007 | 100 | $50.70 | $5,070 | |
| | | 10/29/2007 | 100 | $50.71 | $5,071 | |
| | | 10/29/2007 | 77 | $49.75 | $3,831 | |
| | | 10/29/2007 | 34 | $50.33 | $1,711 | |
| | | 11/13/2007 | 20,998 | $51.75 | $1,086,647 | |
| | | | 42,002 | | $2,132,036 | 61.8% |
| HENRY (Executive Vice President and Chief Information Officer) | VAUGHAN | 10/22/2007 | 5,000 | $49.79 | $248,950 | |
| | | 10/22/2007 | 746 | $49.92 | $37,240 | |
| | | | 5,746 | | $286,190 | 28.1% |
| MORRIS (Chief Executive Officer) | STEPHEN | 8/1/2007 | 6,724 | $49.48 | $332,704 | |
| | | 9/4/2007 | 6,724 | $49.65 | $333,847 | |
| | | 10/1/2007 | 6,724 | $45.75 | $307,623 | |
| | | 11/1/2007 | 6,725 | $49.00 | $329,525 | |
| | | | 26,897 | | $1,303,698 | 6.6% |
| ROSS (Executive Vice President and Chief Administrative Officer) | KATHLEEN | 10/10/2007 | 2,000 | $47.24 | $94,480 | |
| | | 10/22/2007 | 14,000 | $50.00 | $700,000 | |
| | | | 16,000 | | $794,480 | 41.4% |
| | | **Total:** | **178,879** | | **$8,968,051** | |

146.     Defendants' insider trading was unusual and suspicious for at least the following reasons:

(a)     the majority of insider trading took place between October 22, 2007 and November 19, 2007[10] – just one month before the Company announced it would be delaying the

---

[10]     Arbitron admitted that it was "over the[se] past three weeks" that "feedback from [Arbitron's] customers, the Media Rating Council and other constituencies has led [Arbitron] to conclude that the radio industry would be better served if [the Company] were to delay further commercialization of the PPM in order to address their issues."

PPM rollout and revising its financial guidance for 2007 and outlook for 2008 and *after* the decision to delay the rollout of the PPM system had already been made, as set forth above in ¶133;

(b)     the increase in insider sales was accompanied by a stock repurchase completed on October 19, 2007;

(c)     the insider trading occurred at high prices relative to where the price of Arbitron's stock fell at the end of the Class Period; and

(d)     the New York Attorney General is investigating allegations that several Arbitron executives engaged in insider trading.

147.     Additionally, Defendants were motivated to engage in this course of conduct and to conceal the problems associated with the PPM rollout because Arbitron executive bonuses were tied to the rollout of the PPM ratings service.  Under the bonus plan, the commercialization of the PPM ratings service was weighted 20% of the bonus for top executives.

### Loss Causation/Economic Loss

148.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Arbitron stock and operated as a fraud or deceit on Class Period purchasers of Arbitron common stock by, *inter alia*, failing to disclose that the Company's PPM ratings service in certain major markets was not performing according to internal expectations and the Company was experiencing significant difficulties with the PPM ratings service such that it would have to delay its scheduled rollout. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Arbitron common stock fell precipitously as the prior artificial inflation came out of the price of Arbitron common stock.  As a result of their purchases of Arbitron securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

149.    By failing to disclose the problems with Arbitron's PPM ratings service, among other things, Defendants presented a misleading picture of Arbitron's business and prospects.  Thus, instead of truthfully disclosing the uncertainties and delays facing Arbitron, Defendants caused the Company to conceal the adverse problems detailed herein.  During the Class Period, Defendants repeatedly emphasized the development and progress of Arbitron's PPM ratings service.  These representations caused and maintained the artificial inflation in the price of Arbitron stock throughout the Class Period and until the truth was revealed to the market.

150.    Defendants' false and misleading statements had the intended effect and caused Arbitron common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $54.33 per share on August 8, 2007.

151.    On November 26, 2007, Defendants were forced to publicly disclose that Arbitron would be delaying the implementation of its PPM service and revising its financial guidance for 2007 and its outlook for 2008.  As a direct result of Defendants' announcement, the price of Arbitron common stock fell precipitously, by $7.21 per share, or 14.74%.  This drop removed the inflation from the price of Arbitron stock, causing real economic loss to investors who had purchased the Company's stock during the Class Period.

152.    The more than 14% decline in the price of Arbitron common stock after this disclosure came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Arbitron common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants'

fraudulent scheme to artificially inflate the prices of Arbitron common stock and the subsequent significant decline in the value of Arbitron common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

153.    At all relevant times, the market for Arbitron common stock was an efficient market for the following reasons, among others:

(a)    Arbitron stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Arbitron filed periodic public reports with the SEC and the NYSE;

(c)    Arbitron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Arbitron was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

154.    As a result of the foregoing, the market for Arbitron common stock promptly digested current information regarding Arbitron from all publicly available sources and reflected such information in Arbitron's stock price.  Under these circumstances, all purchasers of Arbitron common stock during the Class Period suffered similar injury through their purchase of Arbitron common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

155.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Arbitron who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### Against and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

156.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

159.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Arbitron common stock.  Plaintiff and the Class would not have purchased Arbitron common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

160.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Arbitron common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

161.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    The Individual Defendants acted as controlling persons of Arbitron within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Arbitron, and their ownership of Arbitron stock, the Individual Defendants had the power and authority to cause Arbitron to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  October 19, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
FAINNA KAGAN


DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

## CERTIFICATE OF SERVICE

I, Kelly A. Stadelmann, hereby certify that on October 19, 2009, I caused a true and correct copy of the attached:

Second Amended Class Action Complaint

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

*Kelly A. Stadelmann*

Kelly A. Stadelmann

**Attorneys for Defendants**

Barry G. Sher
William A. Novomisle
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
75 East 55th Street
New York, NY 10022
Telephone: 212/318-6000
212/319-4090 (fax)


James D. Wareham
James E. Anklam
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005
Telephone: 202/551-1700
202/551-1705 (fax)

Jonathan D. Polkes
Anthony J. Albanese
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: 212/310-8000
212/310-8007 (fax)


Richard B. Zabel
Michael A. Asaro
AKIN GUMP STRAUSS HAUER & FELD
LLP
One Bryant Park
New York, NY 10036
Telephone: 212/872-1000
212/872-1002 (fax)