**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

PLUMBERS AND PIPEFITTERS LOCAL UNION
NO. 630 PENSION-ANNUITY TRUST FUND,
on behalf of themselves and a class        08 Civ. 4063 (JGK)
of those similarly situated,

                     **Plaintiffs,**        <u>AMENDED OPINION AND</u>
                                          <u>ORDER</u>

     - against -

ARBITRON INC., ET AL.,

                     **Defendants.**
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

This is a securities action brought on behalf of a proposed
class of investors in Arbitron, Inc. ("Arbitron") pursuant to
section 10(b) of the Securities Exchange Act of 1934 (the
"Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange
Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5,
promulgated thereunder. The lead plaintiff, Plumbers and
Pipefitters Local Union No. 630 Pension-Annuity Trust Fund
("Plumbers"), sues on behalf of a putative class of purchasers
of Arbitron's common stock between July 19, 2007 and November
26, 2007 (the "plaintiffs"). The plaintiffs' second amended
complaint alleges that the defendants, Arbitron and two of its
senior officers, Stephen B. Morris and Sean R. Creamer (the
"individual defendants"), violated section 10(b) and Rule 10b-5
by making false or materially misleading statements or omissions
about Arbitron's planned rollout of a technology known as the

Portable People Meter ("PPM"). The plaintiffs also allege control-person liability against the individual defendants pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The defendants each move to dismiss the second amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and pursuant to the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737. The plaintiffs cross-move to strike certain documents relied upon by the defendants.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the

2

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

A claim under Section 10(b) sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the Complaint "specify each statement alleged to have been misleading[ and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also ATSI Commc'ns, 493 F.3d at 99.

3

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Rorech, 673 F. Supp. 2d at 221.

## II.

### A.

The following facts are undisputed, unless otherwise indicated.[1]

Arbitron is an international media and marketing information firm whose primary business activity, accounting for 88% of Arbitron's revenues, is the provision of audience measurement and related services to radio stations, advertising agencies, and advertisers in the United States. (Second Am. Compl. ¶¶ 2, 45.) Defendant Morris was at all relevant times Arbitron's chairman, chief executive officer (CEO), and

---

[1] The plaintiffs have moved to strike a number of the defendants' exhibits or portions thereof, while the defendants have argued that the Court should not consider portions of the plaintiffs' allegations relying on certain confidential informants. Because none of this material is necessary to the Court's resolution of this motion, it will not be included in this summary of facts.

president. (Id. ¶ 22.) Defendant Creamer was at all relevant times (and still is) Arbitron's chief financial officer (CFO). (Id.) Plumbers purchased shares of Arbitron's common stock on November 13 and 14, 2007. (Mario Alba Jr. Decl. Ex. C (dkt. 8).)

Arbitron collects the data that is at the heart of its business by recruiting and surveying random samples of individuals in various media markets. (Second Am. Compl. ¶ 3.) Until recently, Arbitron collected audience data exclusively by requiring participants in a survey panel to carry a diary in which they recorded manually the radio stations they listened to over the course of a week (the "Diary"). (Id. ¶ 47.)

In 1992, Arbitron began developing the PPM, which was intended to replace the Diary as the standard way of measuring radio audiences (Id. ¶ 49.) The PPM is an electronic device carried by panelists that can identify the radio broadcasts to which a participant is listening; panelists are supposed to carry the PPM with them and, at the end of each day, dock the PPM to its charging station to transmit the day's information to Arbitron. (Id. ¶ 53.)

On March 14, 2006, Arbiton announced that it intended to commercialize the PPM over the following five years, planning to introduce the PPM "into the top 10 radio markets by the fall of 2008, and into all of the top 50 radio markets two to three years thereafter." (Id. ¶ 57.) Prior to entering each market,

Arbitron would test the PPM in that market in a "pre-currency" phase to establish that it could produce reliable ratings in that market; it would thereafter commercialize the PPM ratings for sale to broadcasters and advertisers, a process known as "going currency" or "commercialization" in industry parlance, and discontinue the Diary. (Id. ¶¶ 55-56.) The Diary would continue to be used in the pre-currency phase, but it would be discontinued in the currency phase. (Id.)

As part of its introduction of the PPM, Arbitron sought accreditation from the Media Ratings Council ("MRC"), the leading accrediting agency for audience measurement research. (Id. ¶¶ 8, 61.) The MRC maintains a voluntary code of conduct that asks, among other things, that participating measurement services "use best efforts to obtain accreditation of [a] new product prior to its commercialization," and to give "[s]trong consideration . . . to discontinuing [an] existing accredited currency product only when the replacement currency product has successfully achieved accreditation." (Novomisle Decl. Ex. A-2 at 7.) Before accrediting a measurement system for a particular market, the MRC requires that the system undergo an independent audit that an MRC committee must review and approve. (Second Am. Compl. ¶ 63.)

Arbitron began its rollout of the PPM in Houston, Texas, receiving accreditation from the MRC for Houston in January 2007

6

and commercializing in Houston in June 2007. (Id. ¶ 66.)
Arbitron then entered a pre-currency phase in Philadelphia,
Pennsylvania and New York City, with the intention of
commercializing in New York in December 2007. (Id. ¶¶ 58, 67.)
In all three markets, Arbitron had difficulties with recruitment
and compliance, leading to small sample sizes and, in
particular, underrepresentation of 18- to 34-year-olds[2] and
minority demographic groups. (Id. ¶¶ 74-97.) In some cases,
Arbitron's data was based on a single respondent. (Id. ¶ 89.)
This led to significant declines in the reported ratings for
stations serving African-American and Hispanic audiences. (Id. ¶
97.)

On May 30, 2007, the MRC sent a confidential letter to
Arbitron stating that its audit committee had voted not to
accredit the PPM for Philadelphia at that time. (Rosenfeld Decl.
Ex. A at 1.) The letter detailed a number of problems identified
by the audit, including the underrepresentation of 18- to 34-
year-olds and difficulties with "African-American measurement,"
leading to "much lower [in-tab] rates for Blacks . . . and 18-

---

[2] The second amended complaint refers to the relevant age range
as 18-to-34, while some of the materials in the parties'
exhibits break that demographic into two age ranges, 18-to-24
and 25-to-34. The Court will refer to this demographic as 18-to-
34, unless the relevant source material specifies otherwise.

24."[3] (Id. at 1-3, 5.) The MRC particularly identified the problems in the 18-to-24 demographic and certain nondisclosures as "clear Violation[s] of MRC Minimum Standards." (Id. at 2-3.) The measurement of African-American audiences was a matter of concern to the MRC, and it requested "a formal write-up of Arbitron's latest thinking and commitments on this subject as soon as possible." (Id. at 3.) The MRC noted that it had not yet decided to deny accreditation, and that though it was not at that time making a public announcement related to the Philadelphia PPM, it "expect[ed] that Arbitron [would] continue to report the accreditation status of their PPM services responsibly." (Id. at 5.)

By August, the National Association of Black Owned Broadcasters ("NABOB") had also raised concerns about the PPM's underrepresentation of minorities and 18- to 34-year-olds, publishing a critical press release on August 16. (Novomisle Decl. Ex. A-7 at 1.) In the fall of 2007, more groups began to criticize the PPM's representation of the 18-to-34 and minority demographics. By September 2007, the New York City Council had begun meeting with Arbitron, in response to "outrage in many communities because of possible inaccuracies in methodology that would have resulted in the closing of many minority-owned radio

---

[3] Panelists who are providing usable data are referred to as "in-tab," while panelists who are not complying with survey requirements are referred to as "out-of-tab."

stations in New York City." (Second Am. Compl. ¶ 127.) Then, on November 14, 2007, four major broadcasters — Clear Channel Radio, Cumulus Media, Cox Radio, and Radio One Inc. (the "broadcasters") — issued a joint public letter stating that the PPM had not "provided accurate or reliable data for all demographic groups" to date, and that the "most immediate issue is sample size — especially with regard to 18-34 year olds and ethnic groups." (Novomisle Decl. Ex. A-19 at 1.) The letter particularly singled out the need for the PPM to deliver better data among "Hispanics and African Americans." (Id.) The letter closed by calling for "an action plan to correct these matters within 30 days." (Id.)

Arbiton responded by postponing commercialization in New York City and eight other markets after the close of trading on November 26, 2007, citing the feedback it had received "over the past three weeks." (Second Am. Compl. ¶ 122.) Arbitron revised its financial guidance downward; the following day, Arbitron common stock declined nearly 15% in value, accompanied by statements of surprise at the postponement by industry analysts. (Id. ¶¶ 122-24.)

B.

The plaintiffs allege that Arbitron made a number of misleading statements and material omissions during the class

9

period in relation to the launch of the PPM. The parties proffer seven sets of statements made during the class period: a July 19 quarterly earnings call (Novomisle Decl. Ex. A-6); an August 17 press release (Id. Ex. A-8); an August 31 letter (Second Am. Compl. ¶ 112); a September 24 press release (Novomisle Decl. Ex. A-11); an October 18 quarterly earnings call (Id. Ex. A-14); a November 9 press release (Id. Ex. A-17); and a November 26 press release (Id. Ex. A-20).

In the July 19 quarterly earnings call, defendant Creamer noted that the New York panel was "scheduled to commercialize in December," but that recruitment "remain[ed] challenging." (Id. Ex. A-6 at 3.) Morris specified that the PPM was having particular difficulties recruiting and obtaining compliance in the 18-to-34 demographic, but stated that Arbitron "continue[d] to feel comfortable with the levels of compliance and proof and et cetera," so that it was "not concerned about the . . . fundamental validity of the numbers." (Id. at 15-16.) He also stated that Arbitron was making "ongoing efforts to achieve MRC accreditation." (Id. at 2.)

The August 17 press release was a direct response to NABOB's critical public letter of the previous day. (Id. Ex. A-8 at 1.) In the press release, Arbitron stated that it "appreciate[d] the active participation by NABOB," and that Arbitron and NABOB had "[t]ogether . . . made great strides in

identifying the advantages that electronic measurement brings to radio and to the urban format." (Id.) It demurred to NABOB's criticisms, however, stating that Arbitron "remain[ed] confident in the validity of the PPM service in Houston and Philadelphia" and that "[t]he PPM ratings are not flawed." (Id.) The press release also stated that Arbitron had studied the relationship of sample size to ratings results, and "concluded that there is no directional relationship between sample size and ratings." (Id. at 2.)

The August 31 letter acknowledged that Arbitron was "not hitting [its] sample targets" in Philadelphia or Houston. (Second Am. Compl. ¶ 112.) Nevertheless, it stated, "the audience data are statistically reliable." (Id.) Specifically, the letter said that Arbitron was "doing well with ethnic groups but poorly with young persons of all races." (Id.) Arbitron sent this letter to PPM customers and filed it with the SEC. (Id.)

The September 24 press release highlighted "urban radio in the PPM world," presenting "key findings" from the data gathered by the PPM in Philadelphia. (Novomisle Decl. Ex. A-11 at 1.) The press release stated "that the PPM methodology gives us compelling insight into how to target and reach the essential African-American consumer segment." (Id. at 2.)

In the October 18 quarterly earnings call, both Morris and Creamer stated that the PPM was scheduled to be commercialized

in New York City on December 31. (Id. Ex. A-14 at 2, 17.) Morris
again acknowledged recruitment difficulties in the 18-to-34
demographic, but noted that Arbitron was "confident that [it
was] at adequate levels of quality" although it was "committed
to continuous improvement." (Id. at 3, 16.) He later repeated
that "there's not an issue . . . of fundamental data validity in
Houston or Philadelphia," arguing that statistical weighting
could make up for any sample size problems. (Id. at 6.) As to
MRC accreditation, Morris stated that Arbitron was "committed to
the process of MRC audit and accreditation. The Houston Radio
Service, as you know, is accredited, but Philadelphia is not.
New York is scheduled to complete its audit later this month,
and the process continues." (Id. at 3.) The only mention of
minority demographics was a statement by Morris that the
"[o]verall size of the panel . . . the distribution by
ethnicity, black and Hispanic both, look very good in terms of
total participation." (Id. at 16.)

Arbitron's November 9 press release again sought to respond
to NABOB's criticisms. (Id. Ex. A-17 at 1.) The press release
stated that:

> Eight years of market testing and review by many
> industry research oversight committees have
> established that PPM does in fact produce more valid
> audience estimates than the diary, and on that basis
> Arbitron has moved forward to commercialize. The Media
> Rating Council, which was founded at the behest of the
> federal government to oversee media research, has

accredited PPM in Houston, and has conducted an audit
in Philadelphia. In New York, the audit is underway
and is scheduled to be completed this month.

These reviews are conducted by an independent auditor
to establish that PPM methodology does not breach any
minimum standards of performance.

On the basis of these rigorous reviews by highly
qualified research professionals, Arbitron has
proceeded with the step-by-step rollout of PPM as a
replacement for the diary.

(Id. at 1-2.) The press release went on to acknowledge that
"overall audience numbers are recorded as lower in PPM than in
the diary" and that "some formats and stations report relatively
stronger audiences and some relatively lower audiences, and this
has created considerable concern." (Id. at 2.) For this reason,
Arbitron stated, it had "agreed to have yet another independent
body review the methodology." (Id.) The press release said that
if "any independent oversight group of research professionals .
. . can empirically establish that the PPM data is not valid in
research terms, or that it is less valid than the current diary,
then Arbitron will have to decide how best to address the
issue." (Id.)

The November 26 press release announced the
commercialization delay in New York and other markets. (Id. Ex.
A-20.) The press release quoted Morris attributing the delay to
"feedback from [Arbitron's] customers, the Media Rating Council
and other constituencies" "over the past three weeks." (Id.) The

13

following day, after the close of the class period, Morris said
on a conference call that the grounds for delay were "things
[Arbitron was] working with the MRC on, things [Arbitron was]
working with the ethnic broadcasters," and that they were not
"new" problems, "but they kind of escalated" in the weeks before
the delay. (Second Am. Compl. ¶ 125.)

C.

The second amended complaint alleges that seven high-level
Arbitron insiders, including the individual defendants, sold
178,879 shares of Arbitron common stock for gross proceeds in
excess of $8.9 million during the class period. (Second Am.
Compl. ¶ 145.) In particular, defendant Morris allegedly sold
26,897 shares, amounting to 6.6% of his holdings, for
$1,303,698, while defendant Creamer allegedly sold 373 shares,
amounting to 0.7% of his holdings, for $16,904. (Id.) Other
insiders sold as much as 40% of their holdings, for as much as
$2,426,001. (Id.) Although Creamer's sales took place on
September 17, 2007 and Morris's sales took place in equal monthly
amounts during the class period, the majority of the other
insiders' sales occurred between October 22 and November 19,
within a month of Arbitron's announcement that it would delay
commercialization of the PPM in New York. (Id. ¶¶ 145-46.) The
plaintiffs claim that Arbitron completed a stock repurchase

14

program on October 19, immediately before these sales. (Id. ¶
146.) A Form 10-Q that Arbitron filed on November 2, 2007 states
that this repurchase program was authorized to continue until
December 31, 2008, and it was thus completed ahead of schedule.
(Novomisle Decl. Ex. A-15 at 22.)

The second amended complaint also alleges that "the
commercialization of the PPM ratings service was weighted 20% of
the bonus for top executives." (Second Am. Compl. ¶ 147.)


### III.

Section 10(b) makes it unlawful to "use or employ, in
connection with the purchase or sale of any security . . . any
manipulative or deceptive device or contrivance in contravention
of such rules and regulations as the [SEC] may prescribe." 15
U.S.C. § 78j(b). The SEC's Rule 10b-5 states that it "shall be
unlawful for any person . . . [t]o make any untrue statement of
a material fact or to omit to state a material fact necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not misleading." 17
C.F.R. § 240.10b-5(b). To state a claim under section 10(b) and
Rule 10b-5, a plaintiff must allege that the defendant, in
connection with the purchase or sale of securities, made a
materially false statement or omitted a material fact, with
scienter, and that the plaintiff's reliance on the defendant's

15

action caused injury to the plaintiff. <u>Ganino v. Citizens Utils.</u>
<u>Co.</u>, 228 F.3d 154, 161 (2d Cir. 2000).

The defendants argue that the plaintiffs' allegations fail
to allege (a) any materially false or misleading statements, or
(b) scienter.


                                    A.

The plaintiffs argue that the second amended complaint
alleges both false statements of material fact, and true
statements that are rendered misleading by material omissions.
In determining whether an allegedly false statement or omission
of fact is material, the Court looks at whether there is "a
substantial likelihood that a statement or omission
'significantly altered the "total mix" of information made
available,' as viewed by the 'reasonable investor.'" <u>Ellenburg</u>
<u>v. JA Solar Holdings Co.</u>, No. 08 Civ. 10475, 2010 WL 1983375, at
*5 (S.D.N.Y. May 17, 2010) (quoting <u>Basic, Inc. v. Levinson</u>, 485
U.S. 224, 231-32 (1988)). "Put another way, a fact is to be
considered material if there is a substantial likelihood that a
reasonable person would consider it important in deciding
whether to buy or sell shares of stock." <u>Operating Local 649</u>
<u>Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC</u>, 595 F.3d 86,
92-93 (2d Cir. 2010) (internal quotation marks and brackets
omitted).

                                   16

An omission is actionable under federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002). "[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).

The plaintiffs' main contention is that the defendants made false and misleading statements in saying that the PPM was producing reliable data and was "on schedule" or "on track" for a December 31 rollout. (Pl. Mem. Opp. Def.'s Mot. Dismiss ("Pl. Mem.") 16.) The plaintiffs also point to two narrower sets of alleged false or misleading statements: first, statements that the PPM adequately measured minority demographics; and second, statements regarding MRC accreditation. The defendants respond by arguing that the statements about the rollout schedule were properly balanced forward-looking statements; that any quality problems with the PPM were sufficiently disclosed by either Arbitron or other stakeholders such as NABOB; and that MRC

17

accreditation was optional and was never stated to be a condition of the rollout. Ultimately, the defendants argue, the delay was caused by the broadcasters' criticisms that arrived in November, not by any of the criticisms or measuring problems that arose earlier in the class period, and therefore any alleged false or misleading statements prior to the broadcasters' criticisms are immaterial.

As discussed below, the plaintiffs have alleged actionable false or misleading statements with regard to the PPM's performance in minority demographics and the MRC accreditation process. It is unnecessary at this point in the litigation to consider whether the more general statements of optimism regarding the PPM rollout are independently actionable.

1.

As detailed above, the PPM allegedly had trouble measuring minority audiences due to small sample sizes, leading to substantial criticism in mid-2007. Arbitron heard privately from the MRC no later than May 2007 and from the New York City Council no later than September 2007. (Rosenfeld Decl. Ex. A at 3; Second Am. Compl. ¶ 127.) NABOB began publicly criticizing the PPM with a press release on August 16, 2007. (Novomisle Decl. Ex. A-7 at 1.)

During this period, Arbitron did not publicly express any concerns of its own with regard to its performance in minority demographics. Instead, every public statement by Arbitron between July 19 and October 18 reported satisfaction with the data provided by the PPM (with the exception of the 18-to-34 demographic), with some statements explicitly stating that the PPM was performing well in the area of minority measurement. The record contains the following statements:

- July 19: In a quarterly earnings call, defendant Morris stated that Arbitron was "comfortable with the levels of compliance and proof and et cetera" and was "not concerned about the . . . fundamental validity of the numbers." (Id. Ex. A-6 at 15-16.)

- August 17: In a press release responding to NABOB's criticisms, Arbitron stated that it "remain[ed] confident in the validity of the PPM service in Houston and Philadelphia" and maintained that "[t]he PPM ratings are not flawed." (Id. Ex. A-8 at 1.)

- August 31: Arbitron sent a letter to PPM customers that was filed with the SEC stating that, while there are problems with sample targets and young persons, it is "doing well with ethnic groups." (Second Am. Compl. ¶ 112.)

- September 24: Arbitron issued a press release to promote the PPM's "key findings" about urban radio markets, stating that "the PPM methodology gives us compelling insight into how to target and reach the essential African-American consumer segment." (Novomisle Decl. Ex. A-11 at 1-2.)

- October 18: Along with general endorsements of the quality of the PPM's data, defendant Morris stated that the "[o]verall size of the panel . . . the distribution by ethnicity, black and Hispanic both, look very good in terms of total population." (Id. Ex. A-14 at 16.)

These positive statements flew in the face of the alleged inadequacies of the PPM in measuring minority audiences (which must be taken as true at this stage of the litigation) and the criticisms that Arbitron was then receiving from major stakeholders. Some of the statements — in particular, the August 17 press release — appear specifically to refute the public criticisms that had been launched by NABOB. The earliest that Arbitron suggested publicly that there might be any validity to the charges was in its November 9 press release, when it stated obliquely that "some formats and stations report relatively stronger audiences and some relatively lower audiences, and this has created considerable concern," while expressing general satisfaction with the PPM's performance. (Id. Ex. A-17 at 2.)

The plaintiffs have carried their burden of alleging at this stage of the litigation that these statements were materially false or misleading. A reasonable investor could reasonably take Arbitron's statements to be assurances that there was nothing to NABOB's public criticism of the PPM, and that Arbitron found that there were no significant problems with the PPM's performance among minority demographics. These assurances were material, because "there is a substantial likelihood that a reasonable person would consider [them] important in deciding whether to buy or sell shares of stock." Operating Local 649, 595 F.3d at 92-93 (internal quotation marks

20

and brackets omitted). Given what Arbitron allegedly knew at the time — that its data in these demographics was based on abnormally small sample sizes, which rendered its findings unreliable — the plaintiffs have alleged with sufficient particularity that Arbitron knew its statements to be false or omitted contrary facts in its possession that were necessary to make its statements not materially misleading.

The defendants argue that these statements are not materially misleading for three main reasons. First, they argue that all of their relevant statements were optimistic, forward-looking statements that are not actionable and were, in any event, adequately hedged by language bespeaking caution. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."); In re Loral Space & Commc'ns Ltd. Secs. Litig., No. 01 Civ. 4388, 2004 WL 376442, at *18 (S.D.N.Y. Feb. 27, 2004) (finding "statements about predicted future events . . . reflect[ing] the company's optimism" not actionable where, "in the context of all of statements made by the defendants, no reasonable investor could have been misled by them"). While this may be true of some of the defendants' more general statements, such as their statements that the PPM was "on track" to be commercialized in New York by December 31, their positive descriptions of the PPM's ongoing performance

among minority groups were statements of specific, present-day fact, not optimistic predictions of the future. "[T]here is a discernible difference between a forecast and a fact, and courts are competent to distinguish between the two." Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, --- F.3d ----, 2010 WL 3547602, at *4. As the Court of Appeals for the Second Circuit recently emphasized, "a statement of confidence in a firm's operations may be forward-looking — and thus insulated by the bespeaks-caution doctrine — even while statements or omissions as to the operations in place (and present intentions as to future operations) are not." Id. See also Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) ("While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts." (internal citation omitted)). Accordingly, the defendants' statements that the PPM was then performing well at measuring minority demographics cannot be dismissed as mere puffery or a forward-looking projection.

Second, the defendants argue that the total mix of information available to the reasonable investor included NABOB's criticisms, and that all of the concerns that plaintiffs say were omitted were, in fact, disclosed. These criticisms were reasonably available, defendants argue, because they could be

22

found both in NABOB's press releases and in articles in industry
publications. "The 'total mix' of information may . . . include
information already in the public domain and facts known or
reasonably available to the shareholders," such as information
that "has been widely reported in readily available media."
United Paperworkers Intern. Union v. Int'l Paper Co., 985 F.2d
1190, 1199 (2d Cir. 1993) (internal quotations omitted).
However, this type of "truth-on-the-market defense is intensely
fact-specific and is rarely an appropriate basis for dismissing
a § 10(b) complaint for failure to plead materiality." Ganino,
228 F.3d at 167. And even assuming that press releases from an
advocacy group and articles in niche publications should be
considered part of the total mix (and that the latter are
subject to judicial notice), a reasonable jury could find that
the defendants' emphatic statements vouching for the PPM
overshadowed the concerns raised by outside parties. See id. at
167 ("[C]orrective information must be conveyed to the public
with a degree of intensity and credibility sufficient to
effectively counter-balance any misleading impression created by
the insiders' one-sided representations." (internal quotation
marks omitted)). Accordingly, on the facts before the Court, the
voicing of concerns by outside parties was insufficient to keep
the alleged statements from being misleading.

Finally, the defendants argue that any misleading
impression that its statements between July and October may have
left is immaterial because the complaints from the broadcasters,
not the earlier complaints, prompted the decision to delay the
commercialization of the PPM in New York City. That is a factual
dispute that could not be resolved on a motion to dismiss. The
statements about minority measurement would still be material
irrespective of the resolution of the immediate reason for the
delay in commercialization of the PPM in New York City. The
basic soundness of a product is the sort of fact that "a
reasonable person would consider . . . important in deciding
whether to buy or sell shares" of its creator's stock. Operating
Local 649, 595 F.3d at 92-93. The plaintiffs have alleged
sufficient flaws in the PPM to survive a motion to dismiss based
on alleged lack of materiality.


                              2.

     The plaintiffs also allege that the defendants
misrepresented the status of their attempts to obtain MRC
accreditation in Philadelphia and in New York. As early as May
30, the MRC had informed Arbitron that the Philadelphia audit
was insufficient to earn accreditation. (Rosenfeld Decl. Ex. A.)
After receiving this information, the defendants made the
following statements regarding MRC accreditation:

                              24

- July 19: In a quarterly earnings call, defendant Morris stated that Arbitron was making "ongoing efforts to achieve MRC accreditation." (Novomisle Decl. Ex. A-6 at 2.)

- October 18: In a quarterly earnings call, Morris stated that Arbitron was "committed to the process of MRC audit and accreditation. The Houston Radio Service, as you know, is accredited, but Philadelphia is not. New York is scheduled to complete its audit later this month, and the process continues." (Id. Ex. A-14 at 3.)

- November 9: An Arbitron press release said that "Eight years of market testing and review by many industry research oversight committees have established that PPM does in fact produce more valid audience estimates than the diary, and on that basis Arbitron has moved forward to commercialize." (Id. Ex. A-17 at 1.) It went on to say that "[t]he Media Rating Council, which was founded at the behest of the federal government to oversee media research, has accredited PPM in Houston, and has conducted an audit in Philadelphia. In New York, the audit is underway and is scheduled to be completed this month." The press release then stated that "[o]n the basis of these rigorous reviews by highly qualified research professionals, Arbitron has proceeded with the step-by-step rollout of PPM as a replacement for the diary." (Id. at 1-2.)

At least the November 9 statement could be found to be misleading. As the defendants note, none of the statements said that Arbitron would proceed with commercialization only in markets where it obtained accreditation for the PPM, nor did they say that the Philadelphia or New York audits were proceeding successfully. The July 19 and October 18 statements, considered alone, accurately reflect the state of accreditation. But by maintaining on November 9 that Arbitron was "committed to the process of MRC audit and accreditation" and that the "step-by-step rollout of PPM as a replacement for the diary" was

proceeding "[o]n the basis of" the New York and Philadelphia audits, Arbitron's statements implied that the results to date gave them reason to expect accreditation and validated their plans to proceed with commercialization. This is especially so given that the MRC's Code of Conduct, while voluntary, strongly discouraged "discontinuing [an] existing accredited currency product [before] the replacement currency product has successfully achieved accreditation." (Novomisle Decl. Ex. A-2 at 7.) Moreover, the plaintiffs can plausibly contend that it was misleading to describe the Philadelphia audit without mentioning the negative conclusion of that audit.

The defendants argue that these statements were accurate and entirely consistent with their plan to commercialize in New York with or without accreditation. It is true that Arbitron was under no obligation to obtain or even seek MRC accreditation, and thus the ongoing problems with accreditation did not render the defendants' statements that their commercialization plans were "on track" inaccurate.

But Arbitron's statements regarding MRC accreditation had to be accurate and not misleading in and of themselves. Whether or not Arbitron could obtain MRC accreditation — the industry standard, even if voluntary — is material to the success of its new PPM, to its profitability, and to potential investors. Accordingly, any statements that Arbitron made on the subject

could not be misleading. A reasonable observer might readily have interpreted Arbitron's "commit[ment] to the process of MRC audit and accreditation" to mean that Arbitron intended to follow the MRC's request that it refrain from introducing the PPM prior to accreditation. Similarly, a reasonable observer might have read the November 9 press release as indicating that the completed Philadelphia audit and the ongoing New York audit supported Arbitron's plan to proceed with commercialization.[4] Given the then-existing fact that the audit process weighed against commercialization, the defendants' alleged statements regarding the MRC accreditation process during the class period could ultimately be found to be materially misleading.

## IV.

The defendants also argue that the second amended complaint fails to allege that the defendants acted with the scienter necessary to support a Rule 10b-5 claim. The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." AIG Global Sec. Lending Corp. v. Banc of America Sec., LLC, No. 01 Civ. 11448, 2005 WL 2385854, at *8 (S.D.N.Y. Sept. 26, 2005)

---

[4] Indeed, one of the news articles cited by the defendants interpreted the November 9 press release in exactly this way, describing Arbitron as "adduc[ing the audits] in support" of the rollout. (Novomisle Decl. Ex. A-17 at 7.)

(quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)). The PSLRA requires that a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also ATSI Commc'ns, 493 F.3d at 99.

The plaintiffs allege scienter on both a "conscious misbehavior or recklessness" theory and a "motive and opportunity" theory. The defendants argue that neither theory is supported by the allegations in the complaint. Because the facts must give rise to a strong inference with regard to each defendant, see Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,

551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008), the Court will consider each defendant in turn.

A.

1.

With respect to Creamer, the plaintiffs allege that he had motive and opportunity to commit securities fraud, based on allegedly unusual insider trading during the class period and the existence of a bonus plan tied to commercialization of the PPM. With regard to the alleged insider trading, the plaintiffs claim that Creamer was motivated by a desire to inflate Arbitron's stock price to profit from selling his own shares. A complaint that seeks to base scienter on a corporate insider's sale of his or her own stock must show "unusual" insider sales. See In re Scholastic Corp. Secs. Litig., 252 F.3d 63, 74 (2d Cir. 2001); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." In re Scholastic, 252 F.3d at 74-75.

The plaintiffs' allegations against the purported inside traders as a group could be read to allege a substantial number of inside traders (seven), a substantial portion of stockholdings sold (up to 40%, in the case of one trader), and a perhaps suspiciously timed increase in the volume of insider sales in October and November. As to Creamer in particular, however, the second amended complaint alleges only that he made one sale a full month before the allegedly suspicious trading began, selling a slight 0.7% of his shares for $16,904. (Second Am. Compl. ¶ 145.) This minimal activity lacks any indicia of unusual insider trading, and so cannot support a claim of scienter. Given that the plaintiffs have failed to allege any remotely suspicious trading by Creamer himself, the fact that other insiders may have engaged in unusual trading activity is irrelevant. See In re Scholastic, 252 F.3d at 75; In re Guilford Mills, Inc. Secs. Litig., No. 98 Civ. 7739, 1999 WL 33248953, at *3 (S.D.N.Y. July 21, 1999).[5]

The plaintiffs also argue that Creamer was motivated by a bonus plan in which 20% of Arbitron's top executives' bonuses were contingent on commercialization of the PPM. As a general

---

[5] Because Creamer's trading cannot give rise to an inference of scienter and because, as discussed below, the plaintiffs' claims against Morris can proceed on a different theory of scienter, there is no need to consider the defendants' arguments regarding Arbitron's stock repurchase program or the defendants' 10b5-1 plans.

rule, incentive compensation tied to general corporate profitability is not a basis for a finding of scienter. See Acito, 47 F.3d at 54. "If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Id. Rather, a complaint must allege "a concrete and personal benefit," one "that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (internal quotation marks omitted).

The plaintiffs argue that the alleged bonus plan is distinct from the run-of-the-mill corporate incentive because it is specifically pegged to the commercialization of the PPM in the New York market, rather than to Arbitron's general success. However, the plaintiffs have not explained how the bonus "could [have been] realized by one or more of the false statements and wrongful nondisclosures alleged." Id. (internal quotation omitted). The bonus plan provided a benefit to Creamer only if the PPM was actually commercialized in New York by the end of 2007. As the plaintiffs concede, they have not alleged that the defendants knew prior to October that they could not commercialize the PPM in New York before the end of 2007. (Hr'g Tr. 38-39, Aug. 6, 2010.) Nor have the plaintiffs argued or provided any reason to think that the various alleged

31

misstatements — either the general statements that the PPM was
"on track" or the specific statements regarding minority
demographics and MRC accreditation — increased the chances of
actual commercialization in time for the December 31 deadline.
Accordingly, the bonus plan provided no incentive to make the
misrepresentations actually alleged. Certainly, any inference
that Creamer misled investors to obtain a higher bonus is not
stronger than any contrary inferences, even considered
holistically alongside the plaintiffs' other allegations.
Tellabs, 551 U.S. at 324, 326.


                                2.

     To make out a claim of scienter based on a claim of
conscious misbehavior or recklessness, the plaintiffs must
allege sufficient facts to constitute strong circumstantial
evidence of such behavior. This is typically done by
"specifically alleg[ing] defendants' knowledge of facts or
access to information contradicting their public statements."
Novak, 216 F.3d at 308. Where motive is not apparent, "the
strength of the circumstantial allegations must be
correspondingly greater." Kalnit, 264 F.3d at 142 (internal
quotation marks omitted).

     The Court of Appeals has explained that "reckless conduct
is, at the least, conduct which is highly unreasonable and which

represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation marks omitted); Kalnit, 264 F.3d at 142. In some cases, recklessness can be inferred from "[a]n egregious refusal to see the obvious, or to investigate the doubtful." Chill, 101 F.3d at 269 (internal quotation marks omitted).

With regard to Creamer, the plaintiffs have not alleged facts giving rise to a strong inference of conscious misbehavior or recklessness. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309. Here, the plaintiffs have not alleged with any particularity that Creamer received information about the methodological problems or resulting data from the PPM's pre-currency phases, nor do they allege that he was involved with the MRC audits or the discussions with the New York City Council. See id. ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."); In re Loral, 2004 WL 376442, at *11 ("The plaintiffs' general allegation that internal company reports contradicted the defendants' projections . . . is

insufficient to raise an inference that the defendants were reckless in making those projections.").[6]

The plaintiffs attempt to attribute knowledge of the PPM's flaws to Creamer via the "core operations" doctrine. See, e.g., In re Atlas Air Worldwide Holdings, Inc. Secs. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[I]f a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company."). Whether a plaintiff may rely on the core operations doctrine in light of the PSLRA has not been decided by the Court of Appeals for the Second Circuit. See In re eSpeed, Inc. Secs. Litig., 457 F. Supp. 2d 266, n.209 (S.D.N.Y. 2006). Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1000-01 (9th Cir. 2009); Rosenzweig v.

---

[6] This is so even if every allegation made by the plaintiffs' confidential informants is given full credence. None of these allegations state with any particularity what Creamer knew during the class period. The only allegations that are even loosely related to Creamer's knowledge are that "the PPM was 'closely watched' by the executives" and that "there was an increase in meetings of senior management . . . focused on whether Arbitron was going to meet its internal rollout deadlines" at some unspecified time. (Second Am. Compl. ¶¶ 92, 101.) These fall far short of the particularity needed to allege an individual defendant's scienter.

Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003). Even assuming
that the plaintiffs could rely on the core operations doctrine,
it would not allow for a "strong inference" of scienter against
Creamer. While general knowledge of the PPM and its
commercialization schedule could be attributed to a high-level
officer like Creamer, the plaintiffs' claims rest on more
nuanced, small-bore details concerning individual PPM surveys
and the process of voluntary accreditation. See In re eSpeed,
457 F. Supp. 2d at 294 ("[T]he Complaint is inadequate in this
respect because it does not allege that PI was so vital to
eSpeed that its top officers must have known of the extent of
PI's failure.").

Accordingly, the plaintiffs have failed to allege scienter
against Creamer, and the section 10(b) claim against him must be
dismissed.


                                    B.

Like Creamer, the "motive and opportunity" allegations
against Morris are insubstantial. Although he traded more shares
than Creamer, for over $1,300,000, those shares amounted to just
6.6% of his holdings, and were made in such a regular pattern —
6,724 or 6,725 shares once a month at the beginning of each
month — that they cannot be called "unusual." Nor do the bonus

allegations have any more strength against Morris than they do against Creamer.

On a "conscious misbehavior or recklessness" theory, however, the inference of scienter against Morris is considerably stronger. Morris stated just after the delay of the New York commercialization that "things we're working with the MRC on, things we are working with the ethnic broadcasters" were not "new, but they kind of escalated" in the weeks before the November 26 announcement. (Second Am. Compl. ¶ 125.) This statement suggests that he was familiar with the PPM's problems well before the delay was announced, and supports the inference that he was aware of the discussions with MRC, NABOB, and the New York City Council, as well as the facts underlying their concerns. This inference is strengthened by the fact that Morris was the primary person who spoke about the MRC accreditation process and the situation regarding minority measurement in Arbitron's quarterly earnings calls. Accordingly, it is reasonable to infer that Morris was aware of the significant problems related to both minority measurement and MRC accreditation, and there is a strong inference that Morris was at least reckless in speaking so positively about both matters.

For this reason, the plaintiffs' section 10(b) claim against Morris should not be dismissed.

36

C.

Because the plaintiffs have successfully pleaded scienter as to defendant Morris, Arbitron's then-president, CEO, and chairman, they have also pleaded corporate scienter as to Arbitron. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.").


IV.

The individual defendants also move to dismiss the plaintiffs' claim against them brought under section 20(a) of the Exchange Act. To make out a prima facie case under section 20(a) a plaintiff "must show a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." First Jersey Sec. Inc., 101 F.3d at 1472 (internal quotation marks and brackets omitted).

The individual defendants do not dispute that they controlled Arbitron for the purposes of section 20(a); rather, they claim that the plaintiffs have not shown either a primary

37

violation or culpable participation. Because the plaintiffs have
sufficiently alleged that Arbitron violated section 10(b) and
Rule 10b-5, and have also pleaded facts giving rise to a strong
inference of scienter against Morris, the plaintiffs' section
20(a) claim cannot be dismissed against Morris.

The plaintiffs' claim against Creamer, however, must be
dismissed. Although "[t]he Second Circuit has not defined what
is meant by the requirement that a controlling entity be a
'culpable participant,'" Pension Comm. of the Univ. of Montreal
Pension Plan v. Banc of Am. Secs., LLC, 592 F. Supp. 2d 608, 635
n.192 (S.D.N.Y. 2009), culpable participation at a minimum
"requires 'something more than negligence,'" In re Alstom SA
Secs. Litig., 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005) (quoting
Ernst & Ernst v. Hochfelder, 425 U.S. 185, 209 n.28 (1976)).
Among the district courts within the Second Circuit, "[t]he
weight of well-reasoned authority is that to withstand a motion
to dismiss a section 20(a) controlling person liability claim, a
plaintiff must allege some level of culpable participation at
least approximating recklessness in the section 10(b) context."
Edison Fund, 551 F. Supp. 2d at 231 (internal quotation
omitted). As discussed above, the plaintiffs have not made this
showing with regard to Creamer.

## CONCLUSION

For the reasons stated above, Creamer's motion to dismiss the plaintiffs' claims against him is **granted**, and the claims against Creamer are dismissed with prejudice.[7] The motions to dismiss by Arbitron and Morris are **denied**. The plaintiffs' motion to strike is **denied as moot**. The clerk is directed to close docket Nos. 56, 59, 62, and 65.

**SO ORDERED.**

Dated:   New York, New York
         September 30, 2010

                                        John G. Koeltl
                                United States District Judge

---

[7] The plaintiffs were already given the opportunity to amend their complaint in response to the defendants' first motion to dismiss, with the understanding that any dismissal of the second amended complaint would be with prejudice. (See Pl. Mem. at 58 n.44.)